**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 6, 2009

Charles R. Fulbruge III
Clerk

No. 08-20297

THOMAS R MCALISTER,

Plaintiff - Appellant

v.

BRAD LIVINGSTON, Executive Director Texas Department of Criminal
Justice - Institutional Division; BILL PIERCE, Director of Chaplaincy, Texas
Department of Criminal Justice - Institutional Division; LEONARD LEE,
Religious Program, Director Region IV, Texas Department of Criminal
Justice - Institutional Division; BRENDA CHANEY, Warden II; BILLY J
JOHNSTON, Chaplain I; RICHARD LEAL, Assistant Warden,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas, Houston
No. H-05-3228

Before KING, DAVIS, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Thomas McAlister, Texas prisoner # 1040901, filed this 42 U.S.C. § 1983
civil rights action against numerous employees of the Texas Department of
Criminal Justice—Correctional Institutions Division, alleging violations of the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

First Amendment, the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc–1. McAlister appeals the district court's grant of summary judgment for the defendants. For the following reasons, we VACATE the judgment and REMAND for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Thomas McAlister, prisoner # 1040901, is incarcerated at the Jester III unit of the Texas Department of Criminal Justice—Correctional Institutions Division ("TDCJ—CID" or "TDCJ"). McAlister is a practitioner of Wicca, a lunar-based sub-set of Paganism. The practice of Wicca generally has a "direct relationship with the cycles of birth, growth, death and regeneration in nature and in human lives." Wicca has a "strong association with 'good magic,'" and self-identified practitioners generally have an "optimistic outlook."

The TDCJ Chaplaincy Department provides religious services to 160,641 offenders in the TDCJ—CID system, and those offenders follow 140 different religions. Of those offenders, only 613 have designated Wicca as their faith—constituting 0.38% of the total offender population. At the Jester III unit in particular, only eight offenders are designated as Wiccans, out of 1,086 total offenders—making up 0.74% of the offenders on the unit. In order to make the most efficient use of limited resources, TDCJ provides generic religious services on a regular basis to the five major faith groups: Christian non-Roman Catholic, Roman Catholic, Judaism, Islam, and Native American.

### 1. Possession of Religious Items

Under TDCJ Administrative Directive 7.30, "[o]ffenders may possess religious items which are consistent with their religious orientation and that do not otherwise violate safety and security standards of operation." The TDCJ Chaplaincy Department maintains a list of approved items that Pagan

(including Wiccan) offenders may possess in their cells for solitary practice: (1) a picture of a god or goddess; (2) black prayer beads on a cotton cord, no more than 3/8 inches in size; (3) a medicine pouch, maximum size two square inches of animal skin (may contain natural objects such as feathers or pebbles); (4) a picture of the medicine wheel (also referred to as the wheel of the year); (5) a Book of Shadows (a diary or blank book in which practitioner makes entries describing spiritual experiences); (6) a headband of natural leather or white cloth (may be worn in cell and to and from religious ceremonies). These six items must be kept in the offender's locker box and may only be used in the offender's cell or in designated worship areas. Wiccan offenders may also wear a Wiccan medallion, or pentacle.

In addition to the devotional items for in-cell use, TDCJ also allows certified volunteers to bring approved items into the facilities for religious meetings and ceremonies. These items must be inspected and inventoried before they enter the unit and again when they are removed. These approved items for chapel use include: (1) representations of deities, including statuettes and pictures; (2) ceramic wands with quartz crystal points, up to 12 inches long; (3) an altar pentacle; (4) an altar cloth the size of a large handkerchief; (5) up to five candles; (6) a besom, or ritual broom, up to 24 inches long; (7) a chalice (wooden, plastic, or ceramic); (8) a cast iron cauldron, up to 5.5 inches in diameter; (9) metal or ceramic bowls to mix salt and water; (10) a bell; (11) a Book of Shadows; (12) incense; (13) oil to be used for anointing; and (14) ritual cookies.

TDCJ policy specifically prohibits several items for in-cell use by individual Wiccan offenders: (1) rune stones; (2) tarot cards and books explaining their use; (3) altar (a box the size of a cigar box); (4) wand; (5) candles; (6) oils; (7) herbs; (8) incense; and (9) salt. The policy only explains the prohibition on salt: Wiccan practitioners use salt to draw circles on the floor for meditation purposes, and this might cause people to slip and fall, posing a safety hazard.

Joseph Gunn, an assistant professor of Communication Studies at the University of Texas at Austin, submitted a sworn affidavit on behalf of the TDCJ officials describing the practice of Wicca. Gunn is not a practitioner of Wicca himself, but he has extensively studied non-mainstream religions, including Wicca. According to Gunn, "Wicca is, quite literally, what you make of it." Gunn describes the most common tools used in Wiccan rituals and ceremonies: "the wand; the broom; the chalice; the pentacle (flat disk with pentagram on it); the athame (sword); the bolline (a knife); an incense burner; and the cauldron. Some traditions use less tools, while others use more tools, such as bells, beads, baskets, amulets, alter [sic] cloths, and so on." However, Gunn also posits that "none of the tools are *necessary*," and states that "tools can be used interchangeably," as "the most important aspect of ritual and ceremonial work is the human imagination."

In a sworn affidavit submitted on behalf of McAlister, Cheryll Landis–Gerber, one of the TDCJ-approved Wiccan volunteers, describes the items needed for a meaningful practice of Wicca. In her opinion, the basic requisites include: "a means of divination," either through runes or tarot cards; "a means of purifying and consecrating [one]self . . . most commonly by the use of salt water, incense smoke, or anointing oils"; "some means of casting a [] circle, i.e., a wand"; "a representation of the God and the Goddess"; and "something to represent the [four] Quarters or Elements[,] most commonly [four] candles."

In addition to the TDCJ list of approved Pagan devotional items, McAlister argues that a number of other items are required for a meaningful practice of Wicca; his requests for these items have been denied. In an August 2005 letter to Chaplain Bill Pierce, McAlister requested: (1) an altar cloth, up to 24 by 24 inches; (2) a meditation or prayer rug, 24 by 36 inches; (3) incense and incense holder; (4) small white candles; (5) a smudge wand or regular wand, blunt tip,

about one foot in length; (6) special showers for ritual cleansing before ceremonies; (7) runes and Theban script; (8) a pendulum on cord or chain; (9) tarot cards; (10) an altar in cell; (11) neutral-colored robes; (12) a chalice or ritual cup; (13) a salt dish and libation dish; and (14) Wicca lesson plans. From McAlister's letter, it is unclear whether he requested these items for group practice or for in-cell use. These requests were denied, and McAlister wrote a second letter, requesting that six items be added to the TDCJ's approved list: an altar cloth, salt, a feather, a homemade altar, meditation stones, and a wand. Presumably, the second letter dealt with the list of items approved for in-cell use, as TDCJ already allows an altar cloth and a wand to be brought in for group services in the chapel.

In his complaint, McAlister requested access to 22 items, some of which he did not request in either of the two letters. McAlister added: (1) a brass candle holder; (2) a small altar bell; (3) incense or scented oils with a diffuser; (4) a white robe without a hood; (5) a waist cord nine feet long to close robe; (6) rune stones; (7) meditation media (including tapes for meditation, videos on ritual techniques and practices, and books on Wicca); (8) a pentacle to be displayed on altar; (9) statues of God and Goddess to be displayed on altar; (10) a four-inch cauldron; (11) a prayer rug (sized between 24 by 36 inches and 36 by 42 inches); and (12) a small altar with altar cloth for living area. The small altar with altar cloth is the only item from the complaint that McAlister requested for in-cell use.

## 2. Worship Services, Religious Activities, and Volunteer Policy

TDCJ provides regular worship services to the five main faith groups present within the facilities (Christian non-Roman Catholic, Roman Catholic, Judaism, Islam, and Native American). Where TDCJ employees do not have the requisite expertise or familiarity with a certain religion to provide ministry, certified outside volunteers may meet with offenders, either on a one-on-one basis or in a group setting. Offenders may meet with a certified volunteer for a

5

one-on-one pastoral or instructional visit for up to two hours, twice a month. For group ministry, TDCJ policy allows unit chaplains to schedule "services of worship, religious activities, and meetings of a religious nature" with "reasonable frequency." In scheduling these group religious events, chaplains shall consider: "[s]taff supervision requirements," "[u]nit and individual security concerns as set forth in other Agency policies, or as identified by Wardens," and "availability of TDCJ approved religious volunteers to assist in religious activities." After initial schedules are drawn up based on these factors, additional services or meetings may be scheduled based "on an equitable pro rata formula to all scheduled religious groups," based on "[t]he percentage of the offender population that the requesting group represents, and . . . the amount of time and space available for religious programming." In the event that an approved religious volunteer is not available to supervise an activity, unit personnel may substitute for the volunteers, "as consistent with sound, legitimate prison management."

In sworn affidavits, both Warden Vernon Pittman and Chaplain Pierce state that this policy is applied neutrally at the Jester III unit and throughout TDCJ—CID. However, McAlister presents sworn affidavits from inmates Robert Tuft, the chapel musician for the Jester III unit, and Gerald Armstrong, the Card Clerk for the Jester III unit, both stating that on numerous occasions, groups of Muslim[1] and Jewish offenders have congregated for religious meetings without direct supervision by TDCJ employees or outside volunteers.

McAlister also submitted sworn affidavits on his behalf from Cheryll Landis–Gerber and Howard Gerber (the "Gerber affidavits"), the two approved Wiccan volunteers for the Jester III unit. Prior to the Gerbers' certification as

---

[1] Muslim offenders are allowed to congregate for religious meetings without supervision under a court order from an earlier lawsuit. *See Brown v. Beto*, 4:74-cv-069 (S.D. Tex. 1977).

approved volunteers on November 29, 2005, Wiccan offenders were not allowed to meet as a group, because the Chaplaincy Department does not employ any chaplains who follow or who are knowledgeable about Wicca. Chaplain Billy Johnston stated in a May 21, 2005, letter to Warden Richard Leal that this was due to a lack of infrastructure and organization within the Wiccan community. Chaplain Johnston stated that, at the time of the letter, he had tried and failed to locate any Wiccan volunteers in the vicinity of the Jester III unit. Since the Gerbers' certification, they have visited the unit on a number of occasions to lead religious activities for the Wiccan offenders. Most of their visits have corresponded with the eight Wiccan holy days.[2]

The importance of group ceremonies to a meaningful practice of Wicca is disputed: McAlister recognizes strides have been made by certifying the Gerbers as volunteers, yet he contends the inability of Wiccans to meet for group interaction without the supervision of volunteers or TDCJ employees violates his rights. In his affidavit, Gunn states that "group services are obviously an appropriate and preferable means of practice for the majority of Wiccans," but he also notes that the solitary practice of Wicca is also "an appropriate and acceptable means of religious practice for many Wiccans." Landis–Gerber states that "Wicca is predominately a group religion; one that encourages group rituals with solitary meditation and practices outside of the . . . group observances." McAlister himself describes group practice as "an integral, and central practice to the free exercise of the Faerie Tradition of Wicca." McAlister states that he "values the coven as a way of life," and he finds it "hard to imagine a more valuable and central or meaningful part of [his] practice."

---

[2] The Wiccan holy days are: Imboic (February 1), Ostara (March 21), Beltane (April 30), Litha (June 21), Lugnasad (August 1), Mabon (September 21), Samhain (October 31), and Yule (December 21). The calendar dates for these holy days vary slightly from year to year, as they coincide with the equinoxes and the solstices.

## B. Procedural Background

Proceeding *pro se*, McAlister[3] brought suit under 42 U.S.C. § 1983 in 2006 in the United States District Court for the Southern District of Texas against several TDCJ—CID employees: Brad Livingston (Executive Director), Bill Pierce (Director of Chaplaincy), Leonard Lee (Religious Programs Director, Region IV), Brenda Chaney (Warden II), Billy Johnston (Chaplain I) and Richard Leal (Assistant Warden) (collectively, "TDCJ officials"). McAlister alleged that he cannot freely exercise his religion, as guaranteed by the First Amendment, and he has been subject to religious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. McAlister also complained of violations of his statutory rights under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc–1. McAlister sought declaratory and injunctive relief, as well as punitive damages. McAlister relied mainly on two alleged factual predicates to support these claims: (1) some religious items required for a meaningful practice of Wicca are not allowed to be kept in individual cells or brought in by volunteers for use in group meetings; and (2) Wiccans are allowed to congregate for their religious ceremonies only with an outside volunteer present, while other religious groups can meet without supervision.

During the discovery period, McAlister sought to depose Warden Pittman—a TDCJ employee but not a party to this suit—on written questions; however, the district court did not allow the deposition and denied McAlister's motion to compel the deposition. The district court also denied McAlister's

---

[3] The other inmates were dismissed from this appeal for want of prosecution. Therefore, we refer only to McAlister. In addition, while McAlister challenges in his brief the district court's determination that several of the other inmates did not exhaust their administrative remedies, the other inmates' failure to prosecute this appeal renders this issue moot.

motion for appointment of counsel. The district court did not give reasons for either denial.

The TDCJ officials moved for, and were granted, summary judgment dismissal of all of McAlister's claims. The district court found that McAlister failed to raise a genuine issue of material fact on any of the three claims. On the First Amendment claim, the district court found that McAlister had not shown (1) a substantial burden on his religious beliefs or practices, or (2) that the TDCJ officials' conduct was not reasonably related to legitimate penological interests. As to the RLUIPA claim, the district court found that McAlister failed to show that the TDCJ policy was not the least restrictive means of furthering a compelling government interest in prison security. Finally, on the Equal Protection claim, the district court found that McAlister did not show any intentional discrimination against Wiccans by TDCJ officials.

McAlister timely appealed to this court, challenging the dismissal of his three claims on the grounds that the district court failed to consider all of the summary judgment evidence offered by the plaintiffs and that, in light of that evidence, genuine issues of material fact exist. McAlister also argues that the district court abused its discretion in failing to grant his discovery requests and in refusing to appoint counsel. We have jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

### A. The Claims Dismissed on Summary Judgment

"We review the district court's grant of summary judgment *de novo*, applying the same standard as did the district court." *Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 603–04 (5th Cir. 2008). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *accord Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir.

2009). "A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). The moving party has the burden to show "'the absence of a genuine issue of material fact.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc; per curiam) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). This court must take all the facts and evidence in the light most favorable to the non-moving party. *Breaux*, 562 F.3d at 364. Furthermore, when considering summary judgment's severe consequences in the context of *pro se* prisoner litigation, "'we must always guard against premature truncation of legitimate lawsuits merely because of unskilled presentations.'" *Jackson v. Cain*, 864 F.2d 1235, 1241 (5th Cir. 1989) (quoting *Murrell v. Bennett*, 615 F.2d 306, 311 (5th Cir. 1980)).

## 1. First Amendment Claim

McAlister argues that summary judgment was improper on his First Amendment claims because he raised genuine issues of material fact as to whether TDCJ officials violated his right to free exercise of his Wicca religion. Specifically, he complains that TDCJ officials have denied his requests for devotional items for in-cell and group use and that Wiccan inmates are not allowed to meet to celebrate the eight Wiccan holy days or for group worship without the supervision of an approved volunteer.[4] In its grant of summary judgment, the district court did not specifically address McAlister's argument that he was denied religious items and focused on his challenge to the TDCJ volunteer policy. The district court found that the TDCJ volunteer policy did not

---

[4] McAlister also argues that the district court erred by applying the framework from *Turner v. Safley*, 482 U.S. 78 (1987), to his First Amendment claim, rather than the more recent RLUIPA framework. However, RLUIPA creates a separate method of recovery and does not affect the analysis of an independent First Amendment claim; the two are not conflated, as McAlister repeatedly argues. *See Mayfield*, 529 F.3d at 607–17 (analyzing separately a First Amendment claim—applying *Turner*—and a RLUIPA claim).

place a substantial burden on McAlister's religious exercise and was rationally related to a legitimate interest in prison security. The district court also held that the Wiccans' ability to practice independently in their cells, to possess approved devotional items, and to meet periodically with approved volunteers constitutes an adequate alternative opportunity to practice their religion.

### a. Applicable Law

The First Amendment, as applied to the states by the Fourteenth Amendment, guarantees the right to free exercise of religion. U.S. CONST. amend. I; U.S. CONST. amend. XIV. The constitutional rights of inmates are not absolute: while "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner*, 482 U.S. at 84, "'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system,'" *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)) (internal modification omitted). Judicial restraint is even more appropriate where a federal court reviews the policies of a state penal system. *Turner*, 482 U.S. at 85 ("Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." (internal citation omitted)).

As a threshold matter, the First Amendment protects McAlister's sincerely held religious beliefs and practices. *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972) (drawing distinction between unprotected "matter of personal preference" and protected "deep religious conviction"); *see also Ford v. McGinnis*, 352 F.3d 582, 593–94 (2d Cir. 2003) (holding that where prisoner testified to his belief that the Eid ul Fitr feast was "critical to his observance as a practicing Muslim," his First Amendment claim was not precluded by testimony of Muslim clerics that "participation in the Eid ul Fitr is not religiously required" and inquiring

into what the prisoner "considered central or important to [his] practice of Islam").

If the requested practices constitute sincerely held religious practices or beliefs, the standard to apply to McAlister's claims comes from *Turner v. Safley*. There, the Supreme Court laid out the standard to apply when incarcerated individuals claim constitutional violations: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. The Court laid out four relevant factors. *Id*. at 89–90. First, the state must show a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id*. at 89 (internal quotation marks omitted). The second factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Id*. at 90. The third factor inquires into "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id*. Where accommodation will have a "significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id*. "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id*. This final factor does not require prison officials to "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id*. at 90–91.

Later cases applying the four *Turner* factors have noted that "rationality is the controlling factor, and a court need not weigh each factor equally." *Mayfield*, 529 F.3d at 607. Where a regulation restricts First Amendment rights in a neutral fashion, it is more likely to withstand judicial scrutiny. *See Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989); *Mayfield*, 529 F.3d at 609 ("Requiring neutrality ensures that the prison's application of its policy is

actually based on the justifications it purports, and not something more nefarious."). Furthermore, where a regulation restricts one aspect of an offender's belief system but the offender retains the "ability . . . to participate in other religious observances of [his] faith," courts often reach "the conclusion that the restriction[] at issue . . . [was] reasonable." *O'Lone*, 482 U.S. at 352; *see, e.g.*, *Baranowski v. Hart*, 486 F.3d 112, 121–23 (5th Cir. 2007) (upholding regulation requiring volunteer supervision of group religious activity where policy was neutrally implemented and prisoner retained ability "to participate in alternative means of exercising his religious beliefs").

### b. Analysis

#### 1. Possession of Religious Items

McAlister alleges that a genuine fact dispute remains as to whether TDCJ's rejections of his requests for in-cell and group use of religious items are reasonably related to a legitimate penological interest, as TDCJ has failed to offer specific penological reasons—either at the district court level or on appeal—why McAlister's requested items were denied. TDCJ offered a specific explanation for denying McAlister's request for salt, but did not explain its denial of any of the other items. The record is also unclear about which items McAlister requests for in-cell possession and which he requests for group use.

While the district court recognized this factual predicate and spent two pages of its opinion discussing the items TDCJ allowed and the items McAlister requested, the district court did not specifically rule on this aspect of TDCJ's motion for summary judgment. The district court noted that "[t]he religious items that McAlister requested were not on the list of approved items for in-cell use," but did not address group use and did not apply the *Turner* analysis to McAlister's denied requests for the items, either for in-cell or group use. We leave it to the district court to resolve this issue in the first instance.

The district court should first analyze whether the summary judgment evidence furnished by McAlister is adequate to establish that McAlister sincerely believes that the in-cell possession or group use of these items constitutes a religious practice or belief. TDCJ questions McAlister's sincerity—not as to his practice of Wicca generally, but as to his religious need for each individual item—noting that McAlister has submitted several different lists of items at different points in the litigation. McAlister's sworn affidavit states that "the lack of necessary tools, central to the practice of Wicca," imposed a "substantial burden" on "the free exercise of my religious practice. The record contains conflicting evidence about which items are important to the practice of Wicca. The Gerber affidavits state that a wand, rune stones and tarot cards with books explaining their meaning, a method of purification, and at least four candles are necessary for a basic practice of Wicca. However, Gunn questions if any physical tools or objects are truly required for Wiccan practice.

If, on remand, the district court finds that the summary judgment evidence supports the conclusion that the possession or use of any of these items is a sincerely held religious practice or belief protected by the First Amendment, the district court should also consider (1) whether TDCJ's reasons for denying McAlister access to the items are legitimate penological interests rationally related to the restriction on McAlister's religious exercise;[5] (2) whether McAlister

---

[5] On remand, even if the district court finds that the possession or use of these 29 items constitute a sincerely held religious belief or practice, legitimate penological interests likely justify TDCJ's restrictions on many of them—particularly for the items requested for in-cell use. The court should assess, however, whether the TDCJ's summary judgment evidence supports its restrictions. TDCJ policy specifically warns that salt, when placed on the floor as required by Wiccan rituals, poses a safety hazard and may cause slipping. A wand or a brass candle holder could easily be used as a weapon. A nine-foot cord could be used to hang oneself. Candles, oils, herbs, and incense pose fire dangers and could help escape efforts. *See Hammons v. Saffle*, 348 F.3d 1250, 1255 (10th Cir. 2003) (holding that prison policy prohibiting possession of oil in cells rationally related to legitimate penological interest of prison safety because inmates could use oils "to mask the odor of drugs or to slip out of handcuffs"); *Dettmer v. Landon*, 799 F.2d 929, 933 (4th Cir. 1986) (finding that prisoner had

has adequate alternative means of exercising his religion; (3) the impact that accommodation might have on TDCJ resources; and (4) if any alternative methods of accommodation are possible.

### 2. Volunteer Policy

McAlister alleges that a genuine issue of material fact exists on the neutrality of TDCJ's volunteer policy requiring supervision of group religious meetings. We have reviewed and upheld the TDCJ's volunteer policy under the *Turner* factors on several previous occasions. *See, e.g.*, *Baranowski*, 486 F.3d at 121–22 (rejecting argument that inmates should be allowed to lead services without supervision); *Adkins v. Kaspar*, 393 F.3d 559, 565 (5th Cir. 2004) (upholding volunteer policy where neutrally applied).

On the first *Turner* factor, TDCJ's policy is reasonably related to legitimate penological interests—security concerns and restrictions on resources. However, where we have previously upheld this policy under a *Turner* analysis, we have specifically noted and relied upon its neutral application. *See Mayfield*, 529 F.3d at 608 (citing four Fifth Circuit cases upholding the policy based on its uniformity and neutrality). "[U]nder *Turner*, neutrality must be ensured . . . for summary judgment to be appropriate." *Id.* at 609. McAlister has submitted two sworn affidavits from Gerald Armstrong and Robert Tuft, inmates who have worked in the chapel during their incarceration. Both aver that they have repeatedly witnessed Jewish offenders conducting religious ceremonies without the direct supervision of either an outside volunteer or a TDCJ employee. These

no right to unsupervised use of candles and incense where candles could be "used as timing devices and to make impressions of keys," and incense could be used to cover smell of illegal drugs). Meditation stones could be used as weapons. *See Young v. Saunders*, 169 F. Supp. 2d. 553, 557 (W.D. Va. 2001), *aff'd in part, vacated in part on other grounds*, 34 F. App'x 925 (4th Cir. 2001) ("[R]ocks and stones may be used to harm prison staff and cause security problems if used to jam locks."). We have previously recognized that prohibitions on in-cell possession of rune stones and tarot cards withstand scrutiny under *Turner*. *See Mayfield*, 529 F.3d at 610–11 (finding that rune stones and tarot cards could be used for "gambling, trafficking, and trading," as well as "secretly pass[ing] information").

affidavits raise a genuine issue of material fact as to the neutral application of the TDCJ policy. *See id.* (finding genuine, material fact issue on neutrality of volunteer policy where Native American inmate testified his religious group met without supervision on a near-weekly basis, and stating that *Turner* requires neutrality to support summary judgment). While the district court found that the volunteer policy was supported by the compelling penological interest of security, this interest would be undercut by the non-uniform application of the policy.

As to the second *Turner* prong, alternative means of worship are available to Wiccan inmates despite the TDCJ volunteer policy. The Wiccan inmates are allowed to worship and meditate independently, in their cells, with the religious items that TDCJ has approved. The Gerbers are now approved volunteers, and they have visited the Jester III unit on numerous occasions since their certification in November 2005. Wiccan offenders now may engage in group worship when the Gerbers visit, and they may engage in independent in-cell worship with the list of TDCJ-approved items; therefore, the volunteer policy does not "entirely stifle[] the prisoner[s'] religious expression." *Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992).

Under the third *Turner* factor, the accommodation of the Wiccan offenders would have a great impact on TDCJ—CID's already limited time and resources. As we noted in *Mayfield*, "[i]f all 140 religious groups in the TDCJ requested the ability to meet without an outside volunteer, prison security could be seriously compromised by the need to remove personnel from their usual security posts." 529 F.3d at 610. As to the fourth *Turner* factor, McAlister has not proposed an alternative means of accommodation.

While *Turner* factors two, three, and four weigh in favor of TDCJ, factor one is dispositive for today. *See id.* at 608–10 (analyzing volunteer policy under Turner and finding summary judgment inappropriate where policy was not

16

neutrally applied, even though factors two through four supported TDCJ). Although the TDCJ volunteer policy is facially neutral, McAlister has raised a genuine issue of material fact regarding its neutrality in application. Given "the importance of neutrality to our First Amendment analysis," *id.* at 610, summary judgment was inappropriate on the First Amendment claim on this record.

### 2. RLUIPA Claim

McAlister contends that summary judgment was improper on his RLUIPA claim because he raised a genuine issue of material fact as to whether TDCJ policies impose a substantial burden on his religious exercise. He relies on the same factual predicates that he cited in support of his First Amendment claim: TDCJ's repeated denials of his requests for religious items, and TDCJ's refusal to permit him to meet with other Wiccan inmates to celebrate the eight Wiccan holy days or for group worship without an approved volunteer to supervise. Again, the district court did not specifically address McAlister's argument that he was denied religious items and focused on his challenge to the TDCJ volunteer policy. The district court granted summary judgment for TDCJ on the grounds that McAlister was not substantially burdened in his religious exercise because (1) he can worship independently, in his cell, with an approved list of devotional items; (2) he can meet with approved Wiccan volunteers for two hours each month and gather for group ceremonies when approved volunteers are available; and (3) TDCJ policy allows for observance (but not lay-in) of the eight Wiccan holy days. The district court also found that the TDCJ policy of refusing to allow inmates to meet without volunteers was motivated by a compelling interest in prison security.

### a. Applicable Law

RLUIPA requires that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even

if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interests; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). "RLUIPA imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates." *Mayfield*, 529 F.3d at 612. Yet balancing this higher burden is a legislative expectation that "courts entertaining complaints under [RLUIPA] would accord due deference to the experience and expertise of prison and jail administrators." *Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005) (finding that RLUIPA does not conflict with the Establishment Clause) (internal quotation marks and citation omitted). The Supreme Court has indicated that RLUIPA must be applied "with particular sensitivity to security concerns," and a consideration of the need to maintain "good order, security and discipline." *Id.* at 722, 723.

The RLUIPA framework requires that a court ask two initial questions: (1) is the burdened activity religious exercise? and (2) is that burden substantial? *See Mayfield*, 529 F.3d at 613. "Religious exercise" is defined broadly as: "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Under the first question, we must determine whether the practices McAlister requests permission to engage in are religious exercise—that is, whether "the religious practice[s] at issue [are] important to the free exercise of his religion." *Adkins*, 393 F.3d at 570 (stating that RLUIPA complainant bears burden of proving religious practice is important to free exercise of religion); *see also Cutter*, 544 U.S. at 725, n.13

18

("RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion [but] does not preclude inquiry into the sincerity of a prisoner's professed religiosity."); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009) ("The practice burdened need not be central to the adherent's belief system, but the adherent must have an honest belief that the practice is important to his free exercise of religion." (citing *Adkins*, 393 F.3d at 567)).

In this first inquiry, we must consider the importance of the practice to McAlister himself. The Fifth Circuit has had few occasions to conduct this part of the inquiry, as the sincerity of a religious belief is not often challenged. However, we did address this issue in *Sossamon v. Lone Star State of Texas*, where a prisoner asserted that "kneeling at the alter [sic] in view of the Cross, to pray" was "important to *his* practice of Christianity." 560 F.3d at 333. In response, TDCJ submitted a clerical affidavit pointing out that "Christianity . . . does not consider [the act of kneeling at the altar in view of the Cross a] basic tenet[] of the faith." *Id.* at 332. We held that this affidavit was irrelevant and that the important inquiry was what the prisoner claimed was important to him. *Id.* at 333. In other circuits, "clergy opinion has generally been deemed insufficient to override a prisoner's sincerely held religious belief." *See, e.g.*, *Koger v. Bryan*, 523 F.3d 789, 797, 800 (7th Cir. 2008) (holding that where Thelema religion had no general dietary requirements but where individual Thelemites often included dietary restrictions as part of "personal regimen of spiritual discipline," prisoner's request for special diet was "desire . . . based on his religious beliefs and practices" and protected by RLUIPA).

Turning to the second question, RLUIPA does not define "substantial burden," but in *Adkins v. Kaspar*, we supplied the following definition:

> [A] government action or regulation creates a "substantial burden"
> on a religious exercise if it truly pressures the adherent to

significantly modify his religious behavior and significantly violate his religious beliefs. . . . [T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.

393 F.3d at 570. We emphasized in *Adkins* that this test does not "require that the religious exercise that is claimed to be thus burdened be central to the adherent's religious belief system." *Id.* McAlister bears the burden of showing that a substantial burden exists. *See* 42 U.S.C. § 2000cc–2(b). The substantial burden inquiry is fact-specific and requires a case-by-case analysis. *Adkins*, 393 F.3d at 571.

If McAlister successfully shows a substantial burden on his religious exercise, then the burden shifts to the TDCJ officials to demonstrate that the policies are the least restrictive means of furthering a compelling governmental interest. *See Mayfield*, 529 F.3d at 613 (citing 42 U.S.C. § 2000cc–2(b)). The neutrality of the challenged policy informs this analysis. *See id.* at 614 (noting that non-uniform application of policy suggested "burden is at least partially imposed by the TDCJ's disparate application").

### b. Analysis

#### 1. Possession of Religious Items

McAlister asserts that he has raised a genuine issue of material fact on his RLUIPA claim. TDCJ questions whether McAlister sincerely believes these items are important to a meaningful practice of Wicca, pointing to his inconsistent requests.

We note again that while the district court recognized this factual predicate for McAlister's claim and mentioned the items McAlister requested and the items TDCJ allowed, the district court did not rule on this aspect of TDCJ's motion for summary judgment. We again leave this issue to the district

court to resolve in the first instance. The inquiry should then turn to whether TDCJ's policy imposes a substantial burden; that is, whether it truly pressures McAlister to significantly modify his religious behavior and significantly violate his religious beliefs. *See Adkins*, 393 F.3d at 570.

If the district court finds on remand that McAlister has successfully met his burden of showing both that he sincerely believes the items are important to the practice of Wicca and that TDCJ policies impose a substantial burden on his religious exercise, then the district court should also determine (1) whether TDCJ has a compelling interest in prohibiting possession of each item; and (2) whether the TDCJ policy is narrowly tailored to its interests.[6]

### 2. Volunteer Policy

McAlister argues that fact issues regarding the neutrality of TDCJ's volunteer policy preclude summary judgment on his RLUIPA claim.[7] We have reviewed the TDCJ volunteer policy under RLUIPA on numerous occasions. *See Mayfield*, 529 F.3d at 613–14 (discussing previous Fifth Circuit cases examining TDCJ volunteer policy under RLUIPA and First Amendment). In the RLUIPA context, we have held that "the requirement of an outside volunteer d[oes] not place a substantial burden on . . . religious exercise." *Baranowski*, 486 F.3d at 125 (citing *Adkins*, 393 F.3d at 571). However, we arrived at this holding through a "fact-specific, case-by-case review," and it was based upon a finding that the volunteer policy was uniformly applied to all religions within the prison. *Mayfield*, 529 F.3d at 614. As discussed above, a factual dispute exists on this

---

[6] As discussed above in the First Amendment section, even if McAlister establishes his sincere belief that these items are required for his meaningful practice, TDCJ likely has compelling penological interests (specifically, security and safety) in prohibiting many of these items.

[7] As mentioned previously, TDCJ contests whether group practice is central to Wicca. However, we cannot inquire into centrality, and TDCJ apparently does not question McAlister's sincerity as to his requests for group worship.

record regarding the neutrality of the policy's application. McAlister has presented two sworn affidavits stating that Jewish offenders are allowed to meet without supervision from TDCJ staff or outside volunteers. Nothing in the record explains this lack of evenhandedness or resolves this disputed fact issue. *See id.* As the *Mayfield* court specifically noted when reviewing the volunteer policy under RLUIPA:

> Because the volunteer policy was implemented uniformly in the *Adkins* case, it was not the policy imposing the burden on Adkins' religious practice, but instead the lack of qualified volunteers. [Where] Mayfield . . . presented evidence [calling] into question the uniformity of the policy's application . . . , [it suggested] that the burden [wa]s at least partially imposed by the TDCJ's disparate application.

*Id.* (internal citations omitted). The same reasoning applies here.

Although the district court found, and we agree, that the policy as written is supported by compelling interests in prison security, the factual dispute as to whether the policy is neutrally applied "call[s] into question whether the TDCJ's application of its policy to the [Wiccans] is narrowly tailored to the TDCJ's asserted interests." *See id.* at 615. As a result, the district court improperly granted summary judgment on this part of McAlister's RLUIPA claim.

### 3. Equal Protection Claim

McAlister argues that summary judgment was improper on his equal protection claim, as he raised evidence of non-uniform application of the TDCJ volunteer policy. The district court found that McAlister failed to put forth any evidence to support allegations of intentional discrimination in the supervision of religious ceremonies or in the volunteer program.

#### a. Applicable Law

The Fourteenth Amendment's Equal Protection Clause commands that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216

22

(1982)). In the context of prisoner litigation, the Supreme Court has not required that each religious denomination receive "identical facilities or personnel," but rather that "reasonable opportunities . . . be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). To survive summary judgment on his equal protection claim, McAlister needs to "allege and prove that he received treatment different from that received by similarly situated individuals." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001) (per curiam). In addition, he must also "demonstrate that prison officials acted with a discriminatory purpose" in treating him differently from other similarly situated prisoners. *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995) (per curiam). "'Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group.'" *Id.* (quoting *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992) (per curiam)); *see also Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 862–63 (5th Cir. 2004) (affirming summary judgment dismissal of prisoner's equal protection claim where prisoner "offered little or no evidence that similarly situated faiths [we]re afforded superior treatment, or that TDCJ's policy was the product of purposeful discrimination"). A prisoner must allege either a specific act of discrimination or offer proof of discriminatory intent by prison officials; he may not rest an equal protection claim "on only his personal belief that discrimination played a part" in the complained-of act. *Woods*, 51 F.3d at 580.

### b. Analysis

McAlister claims that two genuine issues of material fact exist regarding whether the TDCJ volunteer policy is uniformly applied at the Jester III unit. First, he argues that a fact issue exists as to whether other religious groups are

23

allowed to meet without supervision. TDCJ policy states that offenders may not congregate or meet for religious ceremonies without the supervision of an approved volunteer or a TDCJ employee. However, McAlister provides affidavits from inmates Tuft and Armstrong averring that this policy is not applied uniformly to all offenders and that Jewish offenders regularly meet without supervision.

McAlister relies on a recent Fifth Circuit case, *Mayfield v. Texas Department of Criminal Justice*, to support his equal protection claim. But *Mayfield* dealt solely with First Amendment and RLUIPA claims, not equal protection.[8] In the equal protection context, to survive summary judgment McAlister must create a fact issue as to whether any unequal treatment was the result of discriminatory intent—intent to cause an adverse effect on the Wiccans or a preferential effect on the Jewish offenders. Here, McAlister has raised a fact issue as to unequal treatment; however, to prevail McAlister must show that TDCJ chose its course of action "at least in part because of, and not simply in spite of, the adverse impact it would have on" the Wiccans. *See Woods*, 51 F.3d at 580. Here, TDCJ has entered evidence of its facially neutral policy and provided affidavit testimony from Warden Pittman and Chaplain Pierce that the policy is applied evenly to all religious groups, except for Muslims (who are governed by a separate court order). McAlister asks us to infer discriminatory

---

[8] In *Mayfield*, we relied on an offender affidavit reporting unequal application of the volunteer policy to reverse summary judgment for TDCJ on a RLUIPA claim brought by a member of the Yahweh Evangelical Assembly (YEA). 529 F.3d at 608–10. There, in a sworn affidavit submitted on behalf of the YEA offender, a Native American offender reported that "[his] religious group[] [was] allowed to hold regular meetings without an outside volunteer . . . on a near-weekly basis." *Id.* at 608. We found that a fact issue existed because the record did not support TDCJ's bald assertion in its appellate brief that "Native Americans are also required to have a volunteer present." *Id.* In the context of the RLUIPA claim, the *Mayfield* court was primarily concerned with the neutrality of the application of the policy—not with whether the Native American's affidavit constituted evidence of intentional discrimination by prison officials.

intent on the part of TDCJ from his evidence of unequal treatment; this we decline to do. A fact issue regarding whether TDCJ neutrally applies its policy does not constitute proof of discriminatory intent. *See Sossamon*, 560 F.3d at 336 (holding that bare allegation that Muslim prisoners received religious accommodations where other members of other religions did not was no more than "bald, unsupported, conclusional allegations that defendants purposefully discriminated" and inadequate to support equal protection claim). While McAlister has created a fact issue as to unequal treatment, his evidence does not show that this unequal treatment was the result of intentional discrimination on the part of TDCJ officials.

Second, McAlister claims that he has raised a genuine issue of material fact about the neutrality of the TDCJ process of approving religious volunteers. He points to the Gerber affidavits, which both describe the volunteer approval process. The Gerber affidavits relate that Chaplain Johnston required the Gerbers to submit all religious items and scripts for religious services for pre-approval before they could receive their certification. The affidavits state that Johnston warned the Gerbers that if they ever deviated from the approved scripts, their status as approved volunteers would be terminated. Later, the Gerbers learned in a conversation with Chaplain Pierce that his office never received the scripts or the items for pre-approval. McAlister alleges that the Gerbers were forced to undergo "unnecessary and unapproved methods of security checks." However, McAlister has not raised any evidence showing how prospective volunteers for other religious faiths are treated. He also has not shown any evidence of intentional discrimination on the part of the TDCJ officials who reviewed the Gerbers' applications. McAlister has neither demonstrated unequal treatment nor shown discriminatory intent by TDCJ officials on this point.

McAlister has failed to raise a genuine issue of material fact on his equal protection claim, and the district court properly granted TDCJ's motion for summary judgment on this claim.

## B. McAlister's Discovery Request

McAlister contends that the district court abused its discretion by denying his motion for a deposition on written question of Warden Pittman and by denying his motion to compel the discovery request. The district court relied upon Pittman's initial affidavit in its opinion granting summary judgment as providing justification for the TDCJ policy of requiring a volunteer or chaplain to be present at all religious ceremonies.[9] McAlister argues that Pittman's statements about prison security interests were conclusory and not based on sound evidence. He avers that his discovery motions would have shown a lack of documentary evidence backing up Pittman's assertions. McAlister posits that because the district court could not consider this additional evidence, the court gave undue deference to Pittman's unsubstantiated assertions. The district court denied McAlister's discovery motions without explanation.

"Discovery matters are entrusted to the 'sound discretion' of the district court," and therefore are reviewed for abuse of discretion. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam) (quoting *Richardson v. Henry*, 902

---

[9] The relevant portion of Pittman's affidavit states:

> Offenders are not allowed to lead their own services, as this would have a negative impact on security. It would allow offenders to assume leadership positions among other offenders, and allow offenders assuming those leadership positions to take advantage of others. Also, offenders would be able to use these types of meetings for such non-religious purposes as conducting illegal activity, planning an escape, gang activity, riot or numerous other type [sic] of actions which would threaten the safety and security of employees, offenders and the public. Based upon my experience, I am aware that offenders have used and attempted to use religious meetings as a guise for illegal activity. Because there are over 140 different faith groups that offenders have designated as their faith, allowing an offender to lead religious services would have a serious impact on any unit.

F.2d 414, 417 (5th Cir. 1990)).  The district court's "discovery rulings will be reversed only where they are arbitrary or clearly unreasonable." *Mayo v. Tri-Bell Indus., Inc.*, 787 F.2d 1007, 1012 (5th Cir. 1986).  After a party files a motion for summary judgment, the "nonmoving party may seek a continuance if []he believes that additional discovery is necessary to respond to the motion." *King*, 31 F.3d at 346 (citing FED. R. CIV. P. 56(f); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1266 (5th Cir. 1991)).  To attain additional discovery, the "nonmoving party must show how the additional discovery will defeat the summary judgment motion." *Id.*  This showing "'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified[,] facts.'" *Int'l Shortstop*, 939 F.2d at 1267 (quoting *Sec. & Exch. Comm'n v. Spence & Green Chem. Co.*, 612 F.2d 896, 901 (5th Cir. 1980)).  Where the non-moving party "fail[s] to show that discovery [i]s necessary to establish any issue of material fact that would preclude summary judgment," the district court's discovery ruling will not be disturbed. *King*, 31 F.3d at 346.

McAlister has not demonstrated how additional discovery would defeat TDCJ's summary judgment motion.  He contends that his proposed deposition on written questions would require Pittman to provide support for his "speculative premises."  McAlister's proposed deposition questions would have delved into Pittman's personal knowledge of specific incidents of illegal activity stemming from religious activities;[10] however, the relevant inquiry for the purposes of the summary judgment motion was whether the TDCJ's volunteer policy was supported by either compelling government interests (for the RLUIPA claim) or legitimate penological interests (for the First Amendment claim).  The

---

[10]  For example, one of McAlister's proposed deposition questions reads: "From your personal knowledge or experience, state when; where; how; and by who [sic] a riot erupted or was planned during a religious service."  This question is not relevant to the inquiries of whether the TDCJ policy is rationally related to a legitimate penological interest or narrowly tailored to a compelling government interest.

district court did not need to rely on Pittman's personal experience with illegal activity within the TDCJ system to find that compelling security concerns or legitimate preservation-of-resource interests justified the TDCJ volunteer policy. Pittman's affidavit described generally the security concerns and limitations on TDCJ resources that motivated the policy. The district court also considered Chaplain Pierce's affidavit, which described serious limitations on resources at TDCJ. Therefore, Pittman's personal experience was only one factor of several that the district court considered in reaching its decision on this issue. Summary judgment would have been appropriate even had the district court not considered the challenged portion of Pittman's affidavit.

McAlister does not argue that further discovery would undercut the other compelling justifications that both Pittman's and Pierce's affidavits offer for the volunteer policy; therefore, any additional evidence produced by the deposition on written question would not have affected the result—the affidavit went only to compelling justifications for the TDCJ volunteer policy, not to the neutrality of its application. This is particularly true in light of the Supreme Court's admonishment in *Turner* that "[w]here other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." 482 U.S. at 90 (internal quotation marks, ellipsis, and citation omitted). Here, McAlister has alternative avenues for religious exercise through in-cell worship and through group worship with volunteer supervision. The district court did not abuse its discretion in denying McAlister's request for additional discovery.

## C. Appointment of Counsel

McAlister contends that the district court abused its discretion in denying his request for the appointment of counsel. He recognizes that the right to counsel is not automatic in civil rights cases, but he argues that this case

28

presents exceptional circumstances justifying appointment of counsel. McAlister complains that RLUIPA claims are more complex than § 1983 claims, justifying the aid of counsel. Additionally, McAlister argues he was not able to adequately present his case himself and appointed counsel would have helped him investigate and present his claims. He also argues that appointed counsel would have advised him to pursue additional claims, including state law claims such as a claim under the Texas Religious Freedom Restoration Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 110.001–110.012 (Vernon 2005). The district court denied his request for appointed counsel without explanation.

We review a district court's decision on whether to appoint counsel in civil cases for abuse of discretion. *See Cupit v. Jones*, 835 F.2d 82, 86 (5th Cir. 1987) ("We will overturn a decision of the district court on the appointment of counsel only if a clear abuse of discretion is shown."). "A civil rights complainant has no right to the automatic appointment of counsel." *Ulmer v. Chancellor*, 691 F.2d 209, 212 (5th Cir. 1982). A district court may appoint counsel "if doing so would advance the proper administration of justice," *Jackson v. Cain*, 864 F.2d 1235, 1242 (5th Cir. 1989), but appointment of counsel is not required "unless the case presents exceptional circumstances," *Ulmer*, 691 F.2d at 212. "Although 'no comprehensive definition of exceptional circumstances is practical,' a number of factors should be considered in ruling on requests for appointed counsel." *Id.* at 213 (quoting *Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982) (per curiam)) (internal citation and modification omitted). These factors include:

> (1) the type and complexity of the case;
>
> (2) whether the indigent is capable of adequately presenting his case;
>
> (3) whether the indigent is in a position to investigate adequately the case; and

(4) whether the evidence will consist in large part of conflicting testimony so as to require skill in the presentation of evidence and in cross examination.

*Jackson v. Dallas Police Dep't*, 811 F.2d 260, 262 (5th Cir. 1986) (per curiam).

Generally, the Fifth Circuit will vacate a district court's denial of a request for counsel where the district court does not "present specific findings explaining why counsel was denied." *Id.* Yet, if the record shows with sufficient clarity the facts underlying the district court's decision, the record alone may suffice. *See id.* (instructing lower courts to "make specific findings on each of the *Ulmer* factors rather than deciding [motions to appoint counsel] in a conclusory manner," yet finding "the clarity of the record" sufficient to support district court's decision).

The clarity of the voluminous record in this case sufficiently supports the district court's decision in this case. The record, 997 pages long, contains numerous pleadings, briefs, and motions that McAlister has drafted and affidavits he has gathered from various individuals. These documents are all relevant and on-point. Turning to the *Ulmer* factors, a RLUIPA case is not so complex as to require appointment of counsel. McAlister has sufficiently investigated his case, and his presentation of his claims and the relevant legal issues to both the district court and to this court for review has been adequate. On this record, no exceptional circumstances exist that would justify the appointment of counsel. The district court did not abuse its discretion in refusing to appoint counsel for McAlister.

## III. CONCLUSION

For the foregoing reasons, we VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.