# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 21, 2012

No. 09-40400

Lyle W. Cayce
Clerk

MAX MOUSSAZADEH,

Plaintiff-Appellant,

versus

TEXAS DEPARTMENT OF CRIMINAL JUSTICE;
BRAD LIVINGSTON, Solely in His Official Capacity as Executive Director
of Texas Department of Criminal Justice, Correctional Institutions Division;
DAVID SWEETEN, Solely in His Official Capacity as Warden of
the Eastham Unit of the Texas Department of Criminal Justice,
Correctional Institutions Division,

Defendants-Appellees.

Appeals from the United States District Court
for the Southern District of Texas

Before KING, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Through more than seven years of litigation, Max Moussazadeh has

No. 09-40400

sought kosher meals while confined at the Texas Department of Criminal Justice ("TDCJ"). The district court, on motion for summary judgment, dismissed Moussazadeh's claim on two independent grounds: failure to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA") and lack of sincerity of religious belief as required under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Moussazadeh appeals, and we reverse and remand.

## I.  Background.
### A.  Procedural History.

While at the Eastham Unit ("Eastham") serving a seventy-five-year sentence for murder, Moussazadeh on July 15, 2005, properly filed a Step 1 administrative grievance complaining that he was "forced to eat non kosher foods" and requesting that he "be allowed to receive kosher meals because it is part of [his] religious duty." He asserted that he is Jewish, that he was "born and raised jewish [*sic*]," and that his family "kept a kosher house hold [*sic*]" all his life. He claims that his faith requires him to "eat kosher foods," and not being able to do so forces him to "go[] against [his] religious beliefs," for which he believes God will punish him. He noted in his grievance that he had contacted the prison chaplain and captain of the mess facility at Eastham to request kosher meals but that his requests had been denied.

On July 21, TDCJ denied Moussazadeh's grievance and refused to provide him with kosher food. It provided no reason for doing so and stated only that as a matter of current policy, it did not provide kosher meals. Appealing the outcome of his Step 1 grievance, on July 29 Moussazadeh filed a Step 2 grievance, which was denied on September 19. The Grievance Response stated that TDCJ could "take no further action in this matter."

Having exhausted the grievance process, Moussazadeh sued TDCJ and

prison officials (collectively referred to as "TDCJ") in October 2005, alleging substantially the same facts as in his grievances. He argued that he was a "sincere adherent of the Jewish faith" and that a fundamental tenet requires that believers "eat food prepared and served in a kosher manner." He noted his grievances and TDCJ's denial of his requests for kosher food, and he asserted that TDCJ's refusal to provide kosher food was a violation of RLUIPA and the Texas Religious Freedom Restoration Act. He requested injunctive and declaratory relief compelling TDCJ to provide him with nutritionally sufficient kosher meals.

About six months after the suit was filed, the district court stayed discovery at the request of the parties to facilitate settlement negotiations. After nearly a year of negotiations, TDCJ began offering kosher food in the dining hall at the Stringfellow Unit ("Stringfellow"), to which, in April 2007, Moussazadeh was transferred; he then began receiving kosher meals from the kitchen free of charge. The parties did not settle, however, because TDCJ refused to meet Moussazadeh's demand for a guarantee that it would not ever deny him kosher food. Two years later, the district court dismissed the case as moot. *Moussazadeh v. TDCJ*, 2009 WL 819497 (S.D. Tex. Mar. 26, 2009).

Moussazadeh appealed the dismissal, and while his appeal was pending, he committed an infraction and was transferred to the Stiles Unit ("Stiles"), which did not provide kosher meals in the dining hall but did offer kosher food for purchase at the commissary. This court remanded, concluding that those changed circumstances rendered Moussazadeh's claim no longer moot. *See Moussazadeh v. TDCJ*, 364 F. App'x 110 (5th Cir. 2010) (per curiam).

On remand, the parties conducted further discovery and filed cross-motions for summary judgment. The district court granted summary judgment for TDCJ on two grounds. First, it held that Moussazadeh's claim was barred by the PLRA, which requires inmates to exhaust their administrative remedies before seeking judicially granted relief. In the alternative, the court dismissed

under RLUIPA based on its conclusion that Moussazadeh was not sincere in his religious beliefs, so there was no substantial burden on his religious exercise. Moussazadeh timely appealed.

## B. Factual Background.

Neither party disputes the fact that Jewish dietary laws, "kashrut," are fundamental to the practice of Judaism as embodied in the Torah and Rabbinic laws. Food that satisfies the biblical and rabbinic requirements is deemed "kosher." Those laws demand that food be stored, prepared, and served in a certain manner, and they exclude certain types of food. For example, pork is *per se* nonkosher. Food that would otherwise be kosher becomes nonkosher if mixed with nonkosher food or brought into contact with utensils that have been used in the preparation of nonkosher food. For that reason, certain types of food must not be served, and a separate set of cookware, utensils, and flatware must generally be used.

Before this suit, TDCJ had no program for providing kosher food to inmates. In fact, during the pendency of this case, TDCJ successfully litigated against another prisoner who had requested kosher food. *See Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007). During settlement negotiations with Moussazadeh, however, TDCJ undertook a study of the logistics and cost of providing kosher food to observant Jewish inmates. It examined kosher programs in other prison systems, such as those in Pennsylvania, Colorado, and the Federal Bureau of Prisons, that offered entirely prepackaged "cold" kosher meals, kosher meals prepared on site, and the "common fare" program of the Bureau of Prisons.

TDCJ considered the benefits and drawbacks of each system and decided to implement a two-tier program. The first, the Basic Designated Jewish Unit, provided kosher meals that could be purchased in the prison commissary, a mar-

ketplace where inmates can purchase food and hygienic items. Basic Units were located at the Darrington, Terrell, Stiles, and Wynne facilities. The second tier, the Enhanced Designated Jewish Unit, provided kosher meals free of charge to Jewish offenders in the prison dining hall. The only Enhanced Unit was located at Stringfellow. To provide kosher food there, TDCJ cordoned off a section of the already extant kitchen and purchased items such as utensils, a refrigerator, a microwave, and a burner for the exclusive preparation of kosher food. The cost of establishing the kosher kitchen was $8,066.26.

TDCJ decided to implement the two-tier program based on factors including cost, convenience, and the dynamics of the Jewish prison population. There are about 900 self-identified Jewish prisoners out of more than 140,000 prisoners in TDCJ custody. Of these, only 70–75 are "recognized" as Jewish, and another 90 are in the conversion process. Because of the cost associated with establishing a kosher kitchen and the low number of Jewish prisoners, TDCJ decided to build its single Enhanced Unit at Stringfellow and move all observant Jewish prisoners there. Stringfellow was chosen because it is classified to house prisoners with a wide range of security levels, everyone except the most violent offenders. Stringfellow also is close to a large Jewish population that TDCJ determined would facilitate kosher certification and would volunteer services and provide religious materials.

Aside from the start-up costs of the kosher kitchen, TDCJ's Enhanced Designated Unit program cost more than regular prison meals. In 2009, TDCJ's expenditures on food service were just over $183.5 million, with a cost per day, per inmate, of $3.87; the cost of food from the Stringfellow kosher kitchen was $6.82. The total extra cost based on TDCJ's 2009 data is roughly $1,095 per year, per inmate. The Basic Jewish Designated Units, on the other hand, do not impose those same costs on TDCJ. Inmates must purchase kosher food at the commissary with their own money, lest they receive the same nonkosher food as

No. 09-40400

does the general population.

After establishing the Enhanced Unit at Stringfellow, TDCJ transferred observant Jewish inmates, including Moussazadeh, there. Moussazadeh remained at Stringfellow for two years and consistently ate the kosher meals, even though they often consisted of food he characterized as "highly distasteful," such as tofu. He alleged that he was harassed by prison officials for his religious beliefs and for his attempt to secure kosher food by means of this suit.

In 2009, Moussazadeh committed serious infractions that increased his security level from G4 to G5. Because Stringfellow was not designated to house G5 level offenders, Moussazadeh was transferred to Stiles. The prison had only a Basic Jewish Designated Unit, and so Moussazadeh did not receive kosher meals from the dining hall. He was able to purchase them in the commissary, which he did at least during the Passover holiday. He also purchased food that was not certified as kosher, such as coffee and sweets. He eventually became eligible to transfer back to Stringfellow, but that eligibility was short-lived, because he again lost it after committing another disciplinary infraction. At the time of oral argument in this appeal, Moussazadeh remains at Stiles, where he does not receive free kosher meals.

## II. Standard of Review.

Summary judgments are reviewed *de novo*. *See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999). Summary judgment is appropriate where, taking the evidence in the light most favorable to the nonmoving party, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also* FED. R. CIV. P. 56(a).

No. 09-40400

III.  Discussion.

A.  PLRA Exhaustion.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA pre-filing exhaustion requirement is mandatory and non-discretionary."  *Gonzalez v. Seal*, No. 11-31068, 2012 U.S. App. LEXIS 25371, at \*3 (5th Cir. Dec. 12, 2012) (per curiam).  The purpose of the exhaustion requirement is twofold.  *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006).  First, it "protects administrative agency authority" by allowing the agency to "correct its own mistakes" rather than being immediately "haled into federal court."  *Id.* (internal citations omitted).  Second, it promotes efficiency insofar as administrative review processes are generally faster and more economical than is litigation. *Id.*  Even where the parties subsequently seek judicial remedies, the administrative-review process often produces a useful record to ease and expedite further proceedings.  *Id.*  *See also McCarthy v. Madigan*, 503 U.S. 140, 150–51 (1992).

In determining exhaustion under the PLRA, we look to the processes established by the prison and the parties' use of these processes, beginning with the sufficiency of the inmate's "complaint."  We "typically use a standard according to which a grievance should give prison officials 'fair notice' of the problem that will form the basis of the prisoner's suit."  *Johnson v. Johnson*, 385 F.3d 503, 516 (5th Cir. 2004).  The complaint must be sufficient in detail to give officials "time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Porter v. Nussle*, 534 U.S. 516, 525 (2002).  If the complaint meets those standards, and if there are no further avenues for administrative resolution, we will find exhaustion.

Where the prisoner's complaint addresses an ongoing problem or multiple

7

No. 09-40400

instances of the same type of harm, prisoners need not file a new grievance in each instance to quality for exhaustion. "As a practical matter," a prisoner cannot be "expected to file a new grievance" each time he is harmed in the same manner.[1] Further, TDCJ's policies expressly direct prisoners not to file multiple grievances for a repeating harm, and they threaten sanctions for excessive filings.[2] Where the original grievance complains of a general prison policy, changed circumstances will not necessarily necessitate re-exhaustion.[3]

Moussazadeh initially went through TDCJ's entire grievance process before filing this suit. In Texas, prison grievances involve a two-step process. The inmate first files a Step 1 grievance, in which he must state the grievance and his proposed relief. If relief is denied, the inmate may then file a Step 2 grievance appealing the denial. Moussazadeh filed both claims. And indeed, before filing formal grievances, he sought the assistance of the prison chaplain and the kitchen captain in resolving the issue. In its denial of his Step 2 grievance, TDCJ told Moussazadeh that no further action could be taken regarding his request for kosher food.

The district court held that Moussazadeh had not exhausted. There was a convergence of changed circumstances, it found, that required him to re-exhaust. Namely, TDCJ put in place a kosher meals program and served Moussazadeh kosher meals from the prison kitchen during his time at Stringfellow. Thereafter, Moussazadeh was transferred to Stiles, which left him in a different position. The district court held that these facts required him to submit new grievances. We disagree.

---

[1] *Johnson*, 385 F.3d at 521 (holding that a prisoner who suffered similar harassment on multiple occasions had sufficiently exhausted even though he had not filed new grievances at each instance of harassment).

[2] *See id.*

[3] *Id.* (citing *Aiello v. Litscher*, 104 F. Supp. 2d 1068, 1074 (W.D. Wis. 2000)).

No. 09-40400

Although Moussazadeh can purchase kosher food at Stiles and did receive kosher food for a time at Stringfellow, the claim that gave rise to his initial grievances and suit remains unchanged.  His original grievance asked TDCJ to "grant [him] access to kosher meals in the prison dining hall."  In the "Action Requested to resolve your Complaint" field, Moussazadeh asked to "receive kosher meals from the unit kitchen and dining hall."[4]  The grievance related to his ability to be fed a kosher, nutritionally adequate diet in the dining hall as a substitute for the nonkosher meals he was being served.  His claim is for relief related to ongoing conduct—he is currently being denied kosher food.  Even though he was granted the relief he requested for a time, it has been taken away from him.

This is analogous to the situation in *Johnson*, in which a prisoner was being assaulted on a regular basis but not every single day.  *See Johnson*, 385 F.3d at 521.  We explained that the pattern of assault did not require multiple grievances.  *Id.*  Johnson did not have to be assaulted each and every day for the conduct underlying his grievance to be considered ongoing.  Similarly, Moussazadeh's claim relates to conduct that continues to occur.

Further, even granting that Moussazadeh's situation has changed with his transfer to Stiles and that he is now free to purchase kosher food, it would be improper to dismiss under the PLRA.  This case has been ongoing for more than seven years.  The administrative process has yet to yield a satisfactory result, and the final grievance response stated that TDCJ would "take no further action."  Insofar as the purpose of exhaustion under the PLRA is to provide notice of the prisoner's grievances and a chance for the prison system to address

---

[4] TDCJ asks us to apply an even narrower reading of Moussazadeh's complaint.  It suggests that his original grievance only requested "access" to kosher food.  That strained understanding of the complaint does not comport with its clear language.  Moussazadeh explicitly requested kosher meals served by the prison kitchen.

them, these proceedings have undoubtedly accomplished those objectives. TDCJ is fully aware of Moussazadeh's requests and complaints. Nothing in the record suggests that, were Moussazadeh to file an administrative grievance, TDCJ would take any action. Forcing re-exhaustion would be fruitless and would needlessly extend already prolonged litigation.

Finding the need for re-exhaustion here would also allow TDCJ and future potential defendants to take improper advantage of the PLRA's exhaustion requirement. To avoid any future suit on grounds of not providing a kosher diet, TDCJ would merely have to transfer the complaining inmate to Stringfellow after a suit was filed, then move for dismissal. Once the suit was dismissed, TDCJ would have free reign to deny the inmate kosher food again. Even assuming good faith on the part of TDCJ, such a system, which would be allowable under the district court's understanding of the PLRA, would be contrary to the purposes of the act.

Finally, the statute states that "[n]o action shall be brought . . . *until*" administrative remedies have been exhausted. 42 U.S.C. § 1997e(a) (emphasis added). Once those remedies are exhausted, the suit may be filed. All of our previous cases upholding dismissals under § 1997e have involved a failure to file grievances at all or a failure to see the administrative review process through to its conclusion.[5] We have never before held that, once he has initially exhausted available remedies, an inmate must re-exhaust based on changed circumstances. The PLRA serves as a threshold; once it is met, a suit may not be dismissed so long as the claims remain the same. In seven years of litigation, Moussazadeh has not amended his initial complaint—in fact, the district court noted that he

---

[5] *See*, *e.g.*, *Robinson v. Wheeler*, 338 F. App'x 437, 438 (5th Cir. 2009) (upholding dismissal for lack of exhaustion where prisoner was told that he could re-file a grievance before the suit was initiated); *Simkins v. Bridges*, 350 F. App'x 952, 953 (5th Cir. 2009) (upholding dismissal for lack of exhaustion where prisoner did not appeal denial of his initial grievance as required).

No. 09-40400

did not need to file an amended complaint.

Moussazadeh exhausted his administrative remedies in 2005 when he properly filed grievances. TDCJ has been on notice since that time of Moussazadeh's complaints and his request for kosher food to be served in the dining hall. "Re-exhaustion" is not required; Moussazadeh has met the exhaustion as a matter of law.

## B.  RLUIPA.

Under RLUIPA, government entities as a general matter may not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability." 42 U.S.C. § 2000cc-1(a). RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). The threshold questions for applying RLUIPA are whether a "religious exercise" is at issue and whether the state action places a "substantial burden" on that exercise.[6] Subsumed within the substantial-burden inquiry is the question whether the inmate sincerely believes in the requested religious exercises. *See id.* at 725 n.13 (noting that inquiries into sincerity are appropriate under RLUIPA). A belief not sincerely held cannot be substantially burdened.

### 1.  Religious Exercise.

"Religious exercise" is defined by RLUIPA as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42

---

[6] *Mayfield v. TDCJ*, 529 F.3d 599, 613 (5th Cir. 2008) (stating that a RLUIPA inquiry "normally requires two separate assessments, first whether the burdened activity is 'religious exercise,' and second whether that burden is 'substantial'").

11

No. 09-40400

U.S.C. § 2000cc-5(7)(A). The parties do not dispute the centrality to the Jewish faith of keeping kosher. Nor do they dispute that eating kosher food constitutes a "religious exercise." The district court properly held this to be so.

### 2. Sincerity.

To be substantially burdened, a religious belief must be sincerely held. "[W]hile the 'truth' of a belief is not open to question, there remains the significant question of whether it is 'truly held.'" *United States v. Seeger*, 380 U.S. 163, 185 (1965). It does not matter whether a religious belief itself is central to the religion, but only that "the adherent [ ] have an honest belief that the practice is important to his free exercise of religion." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 131 S. Ct. 1651 (2011). Sincerity of a belief is an essential initial matter in a RLUIPA claim.

We have "had few occasions to conduct this part of the inquiry, as the sincerity of a religious belief is not often challenged." *McAlister v. Livingston*, 348 F. App'x 923, 935 (5th Cir. 2009). Sincerity is generally presumed or easily established. When we have inquired as to sincerity, however, we have looked to the words and actions of the inmate. *See Sossamon*, 560 F.3d at 332. "[T]he important inquiry was what the prisoner claimed was important to him." *McAlister*, 348 F. App'x at 935.

In addressing whether Moussazadeh's religious beliefs were sincere, the district court correctly looked to his words and actions but incorrectly concluded that those factors established insincerity "as a matter of law." The court decided that Moussazadeh was insincere based on a combination of three findings. First, it found that he purchased "nonkosher" food items—including cookies, soft drinks, coffee, tuna, and candy—while at Stringfellow, despite being served kosher food in the dining hall. Second, the court found that, while at Stiles,

12

No. 09-40400

Moussazadeh purchased the same types of "nonkosher" food from the commissary. Finally, the court noted that Moussazadeh had not filed a grievance requesting a transfer back to Stringfellow from Stiles when he became eligible.

These findings alone, however, do not indicate that Moussazadeh was insincere. In the first place, because the court ruled on a motion for summary judgment, it was required to view the evidence in the light most favorable to the non-movant, who on the issue of sincerity was Moussazadeh. *Celotex*, 477 U.S. at 322. The determination of a substantial burden in general is "fact-specific and requires a case-by-case analysis."[7] This is doubly true regarding sincerity. The district court improperly weighed the evidence proffered by TDCJ more heavily than it did Moussazadeh's.

As an initial matter, the court was incorrect to say that Moussazadeh bought nonkosher food at the commissary. The court concluded that items that were not certified as kosher were *per se* not kosher, but, as Moussazadeh and *amicus curiae* relate, a certificate does not render food kosher or nonkosher. *See* Brief for *Amicus Curiae* American Jewish Committee at 16–22. The items that Moussazadeh purchased, such as coffee and soda, do not need a certificate to be "kosher." *Id.* Although certain adherents of Judaism may consume only certified kosher food, others will consume food that is not *per se* nonkosher. *Id.* Individuals may practice their religion in any way they see fit, and "it is not for the Court to say it is an unreasonable one." *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 261 (5th Cir. 2010). A showing of sincerity does not necessarily require strict doctrinal adherence to standards created by organized religious hierarchies.

---

[7] *McAlister*, 348 F. App'x at 936. *See also Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004) ("We recognize that our test requires a case-by-case, fact-specific inquiry to determine whether the government action or regulation in question imposes a substantial burden on an adherent's religious exercise.").

No. 09-40400

Even assuming, *arguendo*, that some of the food Moussazadeh purchased was nonkosher, that does not necessarily establish insincerity. A finding of sincerity does not require perfect adherence to beliefs expressed by the inmate, and even the most sincere practitioner may stray from time to time. "[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?" *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012). Though Moussazadeh may have erred in his food purchases and strayed from the path of perfect adherence, that alone does not eviscerate his claim of sincerity.

In support of his sincerity, Moussazadeh offered his statements in his initial grievances and complaint that he was born and raised Jewish and has always kept a kosher household. He offered evidence that he requested kosher meals from the chaplain, kitchen staff, and TDCJ. He tendered evidence that, while at Stringfellow, he ate the kosher meals provided to him from the dining hall, even though he found them to be "distasteful" compared to the standard prison fare.

Moussazadeh also showed that he was harassed for his adherence to his religious beliefs and for his demands for kosher food while at Stringfellow. For instance, he alleged that the guards there delayed his mail and searched his cell more often than they did so for other prisoners, sometimes seizing non-contraband items. Moussazadeh offered evidence that he purchased some kosher food in the Stiles commissary, including kosher-for-Passover meals. He also attempted to present testimony from religious authorities supporting his sincerity, though the district court rejected that.

Further, during seven years of litigation, TDCJ had never questioned Moussazadeh's sincerity. It created the two-tier program as part of negotiations with him. It transferred him to Stringfellow so he could receive kosher food and

14

No. 09-40400

transferred him to Stiles because the commissary offered kosher food for pur-
chase.   Those actions establish TDCJ's acknowledgment of Moussazadeh's
sincerity.

Though the sincerity inquiry is important, it must be handled with a light
touch, or "judicial shyness." *A.A. ex rel. Betenbaugh*, 611 F.3d at 262.  We limit
ourselves to "almost exclusively a credibility assessment" when determining
sincerity. *See Kay*, 500 F.3d at 1219.  To examine religious convictions any more
deeply would stray into the realm of religious inquiry, an area into which we are
forbidden to tread.[8]

Moussazadeh has offered sufficient evidence to establish sincerity as a
matter of law.  He has shown through his initial claims, his actions while at
Stringfellow, and his continued prosecution of this suit that he sincerely believes
in the importance of eating kosher food.  His few lapses in perfect adherence do
not negate his overarching display of sincerity.  The district court improperly
eschewed the required "judicial shyness" in determining otherwise.

### C.  Standard on Remand.

Where an inmate's religious beliefs are sincere and his exercise of those
beliefs is burdened, the court must determine whether the plaintiff has estab-
lished that the burden is substantial.  42 U.S.C. § 2000cc-1(a).  If it is, the state
must "demonstrate[ ] that imposition of the burden . . . (1) is in furtherance of
a compelling governmental interest; and (2) is the least restrictive means of fur-
thering that compelling governmental interest." *Id*.  There are thus three ques-
tions the district court must address on remand: whether the regulation sub-
stantially burdens religious conduct, whether the government has a compelling
interest in the regulation, and whether the regulation is the least restrictive

---

[8] *See United States v. Ballard*, 322 U.S. 78, 86–87 (1944) ("Men may believe what they
cannot prove.  They may not be put to the proof of their religious doctrines or beliefs.").

No. 09-40400

means of achieving the interest.

### 1.  Substantial Burden.

Denying all access to kosher food places a substantial burden on the practice of an inmate's faith.  *Baranowski*, 486 F.3d at 125.  We have not opined, however, on the policy of charging inmates for kosher meals.

In addressing substantial burdens on religion under the First Amendment, the Supreme Court has provided useful guideposts for our application of RLUIPA.  In *Sherbert v. Verner*, 374 U.S. 398, 404 (1963), the Court held that withholding unemployment benefits from an individual who could not, based on her religious beliefs, work on the Sabbath would constitute a substantial burden on religion.  Denying benefits would "force[ ] [the plaintiff] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand."  *Id.*  This type of imposition substantially burdens religion because it would be the same as "a fine imposed against appellant for her Saturday worship."  *Id.*  Similarly, in *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 717–18 (1981), the Court held that conditioning receipt of "an important benefit" upon religiously proscribed conduct, or denying a benefit because of "conduct mandated by religious belief," would impose a substantial burden on religion.

Applying these standards to RLUIPA, we held in *Adkins*, 393 F.3d at 570, that a government action substantially burdens a religious belief if "it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."  We explained that

> the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit,

16

and, on the other hand, following his religious beliefs. On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.

*Id.*

TDCJ argues that what is at stake is not pressure or forbidding religious practice but "underwriting" it. TDCJ cites *Cutter*, 544 U.S. at 720 n.8, which noted that "RLUIPA does not require a State to pay for an inmate's devotional accessories." But for two reasons, *Cutter* is distinguishable from the case at hand: First, it addressed an Establishment Clause challenge to RLUIPA. The Court was not focused on analyzing the question of a substantial burden. Second, the benefit requested in *Cutter* was provision of religious items, not food. Like the unemployment payments at issue in *Sherbert*, food is an "essential" benefit given to every prisoner, regardless of religious belief. Based on *Sherbert*, *Thomas*, and *Adkins*, denial of religiously sufficient food where it is a generally available benefit would constitute a substantial burden on the exercise of religion.

TDCJ further cites *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008), as its most persuasive support of the position that there is no substantial burden. Prisoner Patel had requested halal food and was served food that did not comport with his conception of Islamic dietary law. Halal meals that would have satisfied him were available for purchase in the prison commissary. *Id.* at 816. Patel had offered no evidence that he could not afford to purchase the halal food. The court held that the prison did not have to provide him free halal meals from the commissary and that it was not imposing a substantial burden on his religious exercise.

*Patel* is distinguishable on two grounds. First, the Eighth Circuit appears

No. 09-40400

to define "substantial burden" differently from how we define it.  According to the Eighth Circuit, government action must "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion" in order to constitute a substantial burden.  *Id.* at 813 (quoting *Murphy*, 372 F.3d at 988).  Unlike our definition, embodied in *Adkins*, the Eighth Circuit's definition of substantial burden makes no reference to denial of generally available benefits.

Second, *Patel* is distinguishable because both kosher and halal food were already being offered free of charge in the dining hall.  Patel requested not only halal food, which was already being served and satisfied all the other Muslims in the prison, but a particularly nuanced version of halal food.  Additionally, sixteen of the twenty-one meals Patel received each week in the dining hall met his standards.

Where an inmate is denied a generally available benefit because of his religious beliefs, a substantial burden is imposed on him.  Every prisoner in TDCJ's custody receives a nutritionally sufficient diet.  Every observant Jewish prisoner at Stringfellow receives a kosher diet free of charge.  Only Moussazadeh is denied that benefit, because he is forced to pay for his kosher meals.  This practice substantially burdens his ability to exercise his religious beliefs.

## 2.  Compelling Interest.

A governmental entity can escape the prohibition on substantially burdening religious practice where it establishes that it has a compelling interest in doing so.  TDCJ alleges that it has two interests: prison security and costs.  This court held in *Baranowski*, 486 F.3d at 125, that these considerations, in that particular case, constituted a compelling interest.

18

No. 09-40400

TDCJ has failed to produce evidence of security concerns related to providing kosher food at Stiles. It offered evidence that the offenders at Stiles have generally been convicted of more violent crimes, but it did not offer any evidence that those more violent offenders would be more likely to cause violence or safety disturbances as a result of some prisoners being served kosher food. TDCJ relied on bare assertions that more violent offenders would present a greater security threat if different meals were served, but this is insufficient to establish a compelling interest related to these facts. On remand, TDCJ may present evidence substantiating its claims of security concerns, if such evidence exists.

TDCJ has shown that costs for kosher food would be almost double what they would be for the nonkosher "loaf" that is served to other prisoners at Stiles. Moussazadeh does not deny those extra costs. TDCJ's argument that it has a compelling interest in minimizing costs by denying Moussazadeh kosher food, however, is dampened by the fact that it has been offering kosher meals to prisoners for more than two years and provides them at no cost to all observant Jewish inmates that accepted a transfer to Stringfellow.

Further, the increased cost of providing kosher food to all observant prisoners is minimal—even if the more expensive prepackaged meals, as distinguished from the kosher-kitchen meals, were provided three times a day to each observant prisoner, the cost would only be about $88,000 per year. To provide those meals to Moussazadeh alone would cost a fraction of this. To put this amount in perspective, the total food budget of TDCJ is $183.5 million.

In *Beerheide v. Suthers*, 286 F.3d 1179, 1191 (10th Cir. 2002), the court held that excluding a $13,000 expenditure from a budget of over $8 million did not constitute a compelling government interest, even under rational-basis review. That minimal cost was, as a percentage of total outlay, roughly three times higher than the expenditure if TDCJ offered the most expensive kosher meal program to all observant prisoners. Although cost reduction, as a general

19

matter, is unquestionably a compelling interest of TDCJ, we are skeptical that saving less than .005% of the food budget constitutes a compelling interest. We recognize, however, that the inquiry is fact-intensive, and we decline to draw a bright-line rule. *See Adkins*, 393 F.3d at 571.

### 3. Least Restrictive Means.

Assuming, *arguendo*, that TDCJ establishes a compelling interest in security and cost minimization, its chosen means of achieving that interest must be the least restrictive of Moussazadeh's right to exercise his religious beliefs "among available, effective alternatives." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004) (applying the least restrictive means test in the speech context). "Requiring a State to demonstrate . . . that it has adopted the least restrictive means of achieving [a compelling] interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

TDCJ argues that it has chosen the least restrictive means by allowing Moussazadeh to purchase kosher meals at the Stiles commissary. It relies on *Baranowski* to suggest that complete denial of kosher food is among the least restrictive means for achieving its goal of minimizing costs and preventing security risks and that therefore its chosen method is even less restrictive. This, however, improperly broadens *Baranowski*. We there held that, "*[b]ased on the record before us*, . . . [TDCJ's] policy [of denying inmates kosher food] is related to maintaining good order and controlling costs and, as such, involves compelling governmental interests." *Baranowski*, 486 F.3d at 125 (emphasis added).

We did not hold in *Baranowski* that there *cannot* be a less restrictive means of achieving the interests of security and cost reduction, but only that on the record in that case, there was not. We note that, on a subject that demands a fact-intensive inquiry, the record in *Baranowski* was thin—the plaintiff was *pro se* and presented no evidence to rebut any of TDCJ's claims regarding the cost

No. 09-40400

of a kosher food program. Our holding in that case does not foreclose a finding that TDCJ's current program is not the least restrictive means available.

Circumstances since *Baranowski* was decided have changed, as TDCJ and the district court pointed out in their discussion of administrative exhaustion. TDCJ has now offered kosher meals in the dining hall at Stringfellow for years and has offered kosher meals for purchase. To the extent that TDCJ claimed that its least-restrictive means of achieving cost reduction was completely denying prisoners kosher food, that is no longer so. *Baranowski* therefore is instructive but not dispositive.

There thus remains the factual question whether there is a less restrictive means of minimizing costs and maintaining security other than forcing Moussazadeh to pay for all his kosher meals. He has suggested four alternatives less restrictive than forcing him to pay for every meal he eats, which he has stated he cannot afford. Less restrictive means include supplementing the regular diet with prepackaged kosher meals; establishing another kosher kitchen; shipping food to Stiles from Stringfellow's kosher kitchen; and providing prepackaged kosher meals through the commissary for free. On remand, the district court must determine whether any "alternative, available" means would allow TDCJ to achieve any established compelling interest while being less restrictive of Moussazadeh's ability to exercise his religion. If a less restrictive alternative is available, RLUIPA commands that TDCJ adopt it.

For the foregoing reasons, the summary judgment is REVERSED, and this matter is REMANDED for further proceedings. We do not suggest how the district court should proceed or what decisions should be reached in light of the guidance set forth in this opinion. If the court decides, as to any issue, that there are no genuine disputes of material fact, summary judgment may be appropriate. If there are fact issues, the case may be ready for trial on issues other than exhaustion and sincerity, which are now decided as matters of law.

No. 09-40400

We do not mean to hamper the court in any way in its resolution of any questions still needing to be resolved.[9]

---

[9] Moussazadeh's request for reassignment to a different district judge on remand is DENIED. Reassignment is an "extraordinary" remedy that is "rarely invoked." *Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir. 1997). The district judge has handled this matter capably and without bias, and we are confident she will continue to do so.

No. 09-40400

RHESA HAWKINS BARKSDALE, Circuit Judge, dissenting in part:

Amazingly, akin to the adage about "inmates running the asylum", and contrary to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc–2000cc-5, the able majority is permitting this inmate to run the penitentiary. When combined with two other adages–"no good deed goes unpunished" and "don't lose sight of the forest for the trees"–the true character of this action is revealed. In that light, for the issues remanded for further proceedings, the majority's application of RLUIPA's compelling-interest standard, 42 U.S.C.§ 2000cc-1(a)(2), is contrary to precedent and impermissibly substitutes the majority's judgment for that of prison officials. Along that line, the majority ignores Moussazadeh's fault, through his serious disciplinary violations, in bringing about the deprivation about which he complains. Therefore, although I join the majority's denial of reassignment, *Maj. Opn.* at 22 n.9, and join, *dubitante*, its holdings that Moussazadeh has met his threshold exhaustion and sincerity requirements, *Maj. Opn.* at 11, 15, 21, I must respectfully dissent from my esteemed colleagues' vacating judgment for TDCJ and remanding for further proceedings on: whether TDCJ has shown a compelling governmental interest; and whether it has adopted the least restrictive means of achieving that interest (remanded issues).

## I.

In granting summary judgment to TDCJ, the district court's comprehensive and detailed opinion based judgment on failure to satisfy the exhaustion and sincerity issues, and, therefore, did not reach the remanded issues. *Moussazadeh v. Tex. Dep't of Criminal Justice*, No. G-07-574, 2011 WL 4376482 (S.D. Tex. Sept. 20, 2011). No authority need be cited for our ability to affirm the summary judgment based on the issues that are instead being remanded. These issues were raised in district court.

Along that line, the opinion provides compelling support for why

Moussazadeh's claim fails for the remanded issues.   The following two paragraphs from that opinion shine a piercing light on what is really afoot:

> TDCJ–CID defendants also note that Moussazadeh did not request a transfer [from the Stiles Unit] back to the Stringfellow Unit for religious reasons [where a free kosher diet is available] when he became eligible for such transfer and that he filed no grievances complaining that he was denied kosher meals or any religious practice on the Stiles Unit [to which he had been transferred for disciplinary violations]. They further note that Moussazadeh voluntarily committed major disciplinary violations [at Stiles] that resulted in a change of his custodial classification, thereby, depriving him of the opportunity to transfer back to the Stringfellow Unit, where he could freely obtain kosher food.
>
> * * *
>
> Moussazadeh's conclusory declaration does not demonstrate that his professed religious need for a kosher diet motivates his actions or that he has attempted to reform his ways and return to keeping kosher during his two-year incarceration on the Stiles Unit. Rather, his personal desire to harass defendants with an unnecessary lawsuit took precedence, and he was willing to sacrifice his religious dietary beliefs in favor of this secular pursuit. Indeed, he would be without any access to kosher food to this day had defendants not attempted to accommodate his dietary beliefs.

*Id.* at *14-15 (citations omitted).

In the light of these penetrating comments, Moussazadeh asserts here: "the district court suggested that Moussazadeh brought all of this trouble on himself by 'voluntarily committ[ing] major disciplinary violations'". In truth, Moussazadeh *knows* the district court has pinpointed exactly what he is attempting.   He even characterizes this correct statement of fact as an expression of "remarkable hostility", requesting–unsuccessfully–this action's being reassigned to a new judge on remand.  In other words, he was aware that

any hope of success depended on pulling the wool over the eyes of a new judge; the extremely able district judge sees this claim for what it is with 20/20 vision.

## II.

In not affirming the summary judgment on the remanded issues, the majority errs in two ways. First, it applies RLUIPA's compelling-interest standard as if Moussazadeh's claim were to be analyzed in a context other than RLUIPA, such as under the Fourteenth Amendment. In that regard, RLUIPA does not require the exacting review associated with court-created strict scrutiny in such other contexts; indeed, such a harsh standard contravenes the Act's purpose. Second, in refusing to recognize what is really in play, the majority ignores TDCJ's having already provided Moussazadeh the religious benefit he seeks, and his having lost access to it through his repeated, serious disciplinary infractions.

## A.

The majority cites *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), to support its conclusion that a very demanding standard of review is appropriate in analyzing TDCJ's kosher-food policy. *Maj. Opn.* at 20. There, the Court addressed the constitutionality of RLUIPA's predecessor, the Religious Freedom Restoration Act (RFRA). *City of Boerne*, 521 U.S. at 511. As the majority notes, *City of Boerne* stated: the test for the "least restrictive means of achieving [a compelling] interest" is the most rigorous in all of constitutional law. *Id.* at 534. This standard is often referred to as "fatal in fact", because it often leads to the challenged government policy's being struck down. *E.g., Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984).

What the majority fails to take into consideration is that Congress' use in RFRA of this standard, constituting a "considerable congressional intrusion into the States' traditional prerogatives . . . to regulate for the health and welfare of their citizens", is part of the reason why, in *City of Boerne*, RFRA was held

unconstitutional. 521 U.S. at 534. Therefore, in the subsequent RLUIPA context, the standard is necessarily less stringent than its language suggests. Precedent from the Supreme Court, our court, and other circuits bears this out.

Our court has already applied RLUIPA to kosher food *vel non* in TDCJ prisons. *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007). In *Baranowski*, the inmate complained of TDCJ's complete denial of kosher food. *Id.* at 116-19. Our court held: although failure to provide such food did work a substantial burden on the inmate's religious practice, TDCJ could not be forced to add kosher food to its menu:

> Turning to the compelling interest test, Defendants must show that their dietary policy of not providing kosher meals is the least restrictive means of furthering a compelling governmental interest. As the Supreme Court recently explained, "'[c]ontext matters' in the application of that standard." *Cutter [v. Wilkinson]*, 544 U.S. [709, 723 (2005)], 125 S.Ct. 2113 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003)). Courts should apply the "compelling governmental interest" standard with "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.* (quoting S.Rep. No. 103–111, at 10 (1993) 1993 U.S.C.C.A.N. 1892, 1899). RLUIPA, in other words, is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs. *See Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir.2006).

*Id.* at 125. This holding was consistent, of course, with the Supreme Court's opinion in *Cutter*, which held:

> We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not

26

override other significant interests. In [*Thornton v.*] *Caldor*, [472 U.S. 703, 105 S.Ct. 2914 (1985)] the Court struck down a Connecticut law that "arm[ed] Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath." 472 U.S., at 709, 105 S.Ct. 2914. We held the law invalid under the Establishment Clause because it "unyielding[ly] weigh[ted]" the interests of Sabbatarians "over all other interests." *Id.*, at 710, 105 S.Ct. 2914.

We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, see *supra*, at 2118, "[c]ontext matters" in the application of that standard. See *Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. See, *e.g.*, 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Joint Statement 16699 (quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. & Admin.News 1993, pp. 1892, 1899, 1900).

*Cutter*, 544 U.S. at 722-23.

*Baranowksi* thus established that maintaining good order and controlling costs were included in such "compelling interests", and held TDCJ's policy of providing no kosher food whatsoever was "the least restrictive means of furthering" those interests. *Baranowski*, 486 F.3d at 125-26; 44 U.S.C. § 2000cc-1. Despite the majority's attempt to distinguish the cases on their facts, *Maj. Opn.* at 20-21, *Baranowski*'s admonition that RLUIPA does not allow religious accommodation to overrun considerations of prison administration is general in

scope.   As discussed, *Baranowski* held TDCJ did not violate RLUIPA's compelling-interest standard when it provided no kosher-food options. Accordingly, how can it violate that standard now by providing free kosher meals at one unit and making them available for purchase at several others?  The majority posits, for example, that the increased cost of providing free kosher meals outside Stringfellow would be relatively minimal.  *Maj. Opn.* at 19-20. Even if correct, that is for prison officials, not our court, to add to the mix for their decision in this instance.

Other courts have similarly determined RLUIPA's compelling-interest standard is more forgiving to prison systems than the court-created, strict-scrutiny standard normally is to government policies.   For example, in *Hoevenaar v. Lazaroff*, the inmate wanted to grow a "kouplock", a small section of hair at the base of the skull that is grown longer than the rest of the person's hair, to conform with his religious practice.  422 F.3d 366, 367 (6th Cir. 2005). The Ohio prison warden defended his system's absolute ban on long hair, noting its security interests in preventing inmates from hiding contraband in their hair and eliminating an easy way for recently-escaped inmates to quickly change their appearance (*i.e.* by cutting their hair).  *Id.* at 369.

The district court ruled:  because the inmate was classified only as "medium security" and in bad health, his kouplock was unlikely to pose a security threat; and the warden should have taken that into account in applying the hair-length rule to him.  *Id.* at 368.  The Sixth Circuit reversed because the district court "did not give proper deference to the opinions of . . . veterans of the prison system".  *Id.* at 371.  When analyzing a RLUIPA claim, courts must accord "requisite deference to the expertise and experience of prison officials" in their approach to the prison system's compelling interests and the appropriate means of achieving them.  *Id.*

This more deferential standard is a far cry from court-created strict

scrutiny, in which the whole point is for the court to apply its own judgment to determine whether a government policy is sufficiently narrowly tailored to a truly compelling interest. *See Johnson v. California*, 543 U.S. 499, 512-13 (2005). In this context, the summary judgment record demonstrates there is no genuine dispute of material fact that necessitates the remanded issues.

Nevertheless, the majority has impermissibly substituted its judgment for that of the professionals at TDCJ, including implicitly accepting an inmate's assessment of whether granting his wishes poses a security problem. Moussazadeh contends there is no reason to believe what worked at Stringfellow would not work at Stiles, despite TDCJ's having shown the inmates housed at Stiles tend to be far more dangerous than those at Stringfellow. The majority dismisses this clear difference in security situations as a "bare assertion[]", *Maj. Opn.* at 19, and adopts Moussazadeh's analysis, despite the obvious fact that "a prisoner's view of what promotes prison security is hardly objective". *Borzych v. Frank*, 439 F.3d 388, 391 (7th Cir. 2006) (Easterbrook, J.).

Moussazadeh's alternative solution–that he and other Orthodox Jewish inmates be guaranteed they will never be transferred away from Stringfellow–presents a similarly obvious security concern. Stringfellow is not designed to house TDCJ's most dangerous inmates, and introducing some of those offenders into Stringfellow's environment would change the facility's entire character. Pursuant to the Supreme Court's admonition in *Cutter*, Moussazadeh's religious diet cannot be elevated above these legitimate security concerns. 544 U.S. at 723.

Moreover, TDCJ has presented legitimate concerns that granting Moussazadeh special treatment will not end there. For example, the cost and security concerns associated with providing him free kosher meals at one of TDCJ's most dangerous prisons would likely multiply, as "inmates of other faiths would seek similar privileges". *Baranowksi*, 486 F.3d at 118 (quoting testimony

of TDCJ official).

These are but a few examples of the legitimate security and cost burdens TDCJ has resolved. The majority should have deferred to the judgment of prison officials on these questions and, accordingly, affirmed the summary judgment.

**B.**

Moreover, in assessing whether to affirm the summary judgment on the remanded issues, the majority refuses to recognize what truly is at issue. Moussazadeh's disciplinary violations have caused this litigation to drag on. They should be an important factor in affirming the summary judgment.

When housed at Stringfellow, Moussazadeh was given exactly what he seeks now: kosher food provided free of charge in the prison dining hall. He is no longer housed at Stringfellow–not because TDCJ chose to move him away from the kosher kitchen there, but because prison officials found cellular phone parts, cash, an iPod, hand-rolled cigarettes, a lighter, and marijuana in his cell. This major disciplinary infraction, which the majority glosses over, *Maj. Opn.* at 3, 6, downgraded Moussazadeh's security status; as a result, he was no longer eligible for housing at Stringfellow. Therefore, he was moved because of his refusal to follow well-known and necessary prison rules against contraband; yet TDCJ made a special effort to continue accommodating his claimed desire to keep kosher by transferring him to Stiles, where he could buy kosher food.

Once there, Moussazadeh did not reform his behavior in order to improve his security status and earn a transfer back to Stringfellow. On the contrary, his wife smuggled more cellular phone parts to him during a visit to Stiles. Further, even though he has been eligible for transfer back to Stringfellow during part of his time at Stiles, as of oral argument for this appeal he had never requested the transfer. At base, Moussazadeh is demanding what he had not even tried to obtain for himself. Worse, he is seeking to undermine the prison system's disciplinary process. The district court recognized this fault on the inmate's

part. Yet the majority, in refusing summary judgment to TDCJ, does not consider the conduct a factor in its decision.

The Texas prison system should not be required to choose between: giving up its right to transfer, for disciplinary reasons, inmates who keep kosher; or incurring financial and security hardships in order to accommodate, even more robustly than it already does, such inmates when they commit disciplinary violations. Our precedent is unequivocal in holding RLUIPA is not meant to impose such hardships on prison officials' ability to perform their difficult and dangerous jobs. *Baranowski,* 486 F.3d at 125.

### III.

Consistent with RLUIPA, proper deference must be accorded decisions by prison officials. And, Moussazadeh's conduct in prison should result in even more deference being accorded. Unfortunately, the majority does just the opposite. Therefore, I must respectfully dissent from the summary judgment's not being affirmed.