In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1817

SHAREEF CHILDS,

*Plaintiff-Appellant,*

*v.*

CHERYL WEBSTER, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 22-cv-256 — **James D. Peterson**, *Chief Judge.*

ARGUED SEPTEMBER 25, 2025 — DECIDED MARCH 4, 2026

Before BRENNAN, *Chief Judge*, and EASTERBROOK and SYKES, *Circuit Judges.*

BRENNAN, *Chief Judge.* Shareef Childs is an inmate at Stanley Correctional Institution in central Wisconsin. As a practicing Muslim, he prays five times each day and believes he must start his prayers at precise times. One of Stanley's chaplains printed and distributed prayer schedules that Childs and other Muslim inmates used to guide the timing of their prayers. They soon discovered the prayer schedules were off by

several minutes. When Childs requested an accurate schedule, the chaplains declined to provide him one.

Childs sued, alleging violations of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") and his constitutional right to freely exercise his religion. The district court granted the defendants' motion for summary judgment. We decide whether the defendants, by declining to use government funds to provide Childs an accurate prayer schedule, placed a "substantial burden" on his religious exercise in violation of RLUIPA. We also decide whether the defendants violated the Free Exercise Clause of the First Amendment.

## I. Background

We recount the facts in the light most favorable to the non-moving party Childs. *See Kluge v. Brownsburg Cmty. Sch. Corp.*, 150 F.4th 792, 804 (7th Cir. 2025).

Salah, one of the basic pillars of Islam, consists of five daily prayers. Muslims aim to offer these prayers at precise times based on the sun's position in the sky. As the Earth orbits the sun and rotates, proper prayer times vary by day and location. Therefore, many Muslims use prayer schedules keyed to their location to know when to pray. Viewing prayer times as windows that open and close throughout the day, Childs strives to pray promptly when the window opens, believing that failure to do so is a "major sin." To do this, Childs needs an accurate prayer schedule. The parties do not dispute the sincerity of Childs's belief.

Chaplain Craig Lindgren plans and directs religious programs at Stanley prison. In January 2023, Lindgren accessed www.islamicfinder.org to look up the Salah prayer schedules for 2023. Using prison resources, Lindgren printed copies and

made them available to inmates in the chapel. Muslim inmates, including Childs, used these schedules to guide the timing of their prayers in the first part of 2023. Corrections Program Supervisor Cheryl Webster, who supervises the prison's chaplains and coordinates religious services and activities, also relied on these prayer schedules to time the delivery of meal bags during the Muslim holy month of Ramadan.

Childs soon discovered that these prayer schedules were inaccurate. In late March 2023, near the beginning of Ramadan, Childs noticed his sunset prayer time did not correspond with the setting sun viewed through his window. Childs and other Muslim inmates notified Lindgren. After checking his work, Lindgren concluded he had entered the wrong location into the website, and that the prayer schedules were thus off by several minutes. After relaying this up the chain, Webster instructed Lindgren and Chaplain Steve Mohr to print accurate prayer schedules to guide the timing of Ramadan meal bag deliveries.

But the chaplains did not print and distribute revised prayer schedules to inmates. When Childs asked why, Lindgren responded that providing the schedules was "a courtesy" not required by the Wisconsin Department of Corrections Division of Adult Institutions policy. Under this policy, inmates may possess approved religious property items. They may also receive these items by donation or by purchasing them from outside vendors. The policy does not, however, permit prisons to purchase such items for inmates:

"Appropriated (i.e., taxpayer) funds shall not be used to purchase inmate personal property items," religious or otherwise.[1]

The prison at Stanley followed this policy. At all times, staff permitted Muslim inmates, including Childs, to possess prayer schedules, to receive them by donation through the chapel, and to purchase them from outside vendors. In fact, Childs eventually received an accurate prayer schedule by donation from a visiting imam. For context, the chaplains do not provide religious calendars or schedules for any other religious groups.

After exhausting the internal prison grievance process, Childs sued Webster, Lindgren, and Mohr. Relevant to this appeal, Childs alleged that the defendants violated the Free Exercise Clause of the First Amendment by providing inaccurate prayer schedules during the first part of 2023 and brought this claim under 42 U.S.C. § 1983. Childs also advanced a RLUIPA claim and a second Free Exercise claim. He asserted the defendants violated his statutory and constitutional rights by not printing and distributing accurate prayer schedules to guide their prayer during the rest of 2023 and in 2024.

In support of his claims, Childs maintains that he lacked an accurate prayer schedule for the remainder of 2023. But he did not describe his efforts to obtain one. And although he received a donated prayer schedule in 2024, he complains that he did not receive one provided by the prison.

---

[1] Division of Adult Institutions, Policy and Procedures, 309 Resources for Inmates, Religious Property 309.61.02 (I)(A), (B)(6), (F)(1)–(3) (effective 11/20/2022).

Defendants moved for summary judgment, which the district court granted on all claims. Concerning the inaccurate prayer schedule in the first part of 2023, the court ruled that a § 1983 constitutional tort claim requires more than negligence: "[N]o evidence in the record suggest[s] … anything other than a mistake by Lindgren, which is not enough to violate the Constitution."

The district court assumed that the failure to provide prayer schedules for the rest of 2023 and in 2024 had substantially burdened Childs's religious exercise. Still, the court found no violation. It explained that neither RLUIPA nor the Free Exercise Clause "requires prison officials to purchase religious materials for prisoners using government funds." *See Cutter v. Wilkinson*, 544 U.S. 709, 720 n.8 (2005). The court also emphasized that, although the prison declined to provide prayer schedules, inmates were still free to possess them and to obtain them by other means.

Even if the defendants violated the Free Exercise Clause, though, the district court concluded that qualified immunity shielded them. No clearly established law put them on notice that ceasing to provide "religious materials to prisoners as a courtesy" would violate the First Amendment.

Childs appeals. The district court's grant of summary judgment to the defendants is reviewed de novo, "construing all conflicts in the evidence and drawing reasonable inferences for the nonmovant." *Kluge*, 150 F.4th at 804. We address his RLUIPA claim first, followed by his Free Exercise claims.

## II. RLUIPA Claim

Our evaluation proceeds in three steps. As background we review RLUIPA's enactment and structure. Next, assuming

Childs's claim should be treated like other RLUIPA claims, we consider whether he satisfied the "substantial burden" requirement under our caselaw. Then we question that assumption and answer whether RLUIPA requires states to subsidize religious exercise by purchasing religious items.

### A. RLUIPA's Background and Structure

The Free Exercise Clause of the First Amendment protects an individual's religious exercise. Cases like *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972), and *Sherbert v. Verner*, 374 U.S. 398, 403 (1963), required even facially neutral laws that incidentally burden religious exercise to survive strict scrutiny. In *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that the Free Exercise Clause does not exempt religious exercise from neutral rules of general applicability. *Id.* at 879.

Desiring a return to greater protection, Congress enacted the Religious Freedom Restoration Act of 1993 ("RFRA"). 42 U.S.C. §§ 2000bb *et seq*. RFRA provides that a government may not substantially burden a person's religious exercise unless it can survive strict scrutiny. *Id.* § 2000bb-1(b). RFRA's protections also expressly apply to laws of "general applicability," *id.* § 2000bb-1(a), reflecting Congress's judgment that incidental burdens interfere with religious exercise just as much as intentional ones, *id.* § 2000bb(a)(2).

But the Supreme Court firmly held the line. In *City of Boerne v. Flores*, the Court curtailed RFRA's scope. 521 U.S. 507, 529–32, 536 (1997). As enacted, RFRA extended to all laws, regulations, and actions taken by state governments and the federal government. The Court enjoined the statute's

application to the states, explaining that it exceeded Congress's Fourteenth Amendment enforcement power. *Id*. at 536.

This time Congress responded by enacting RLUIPA. Invoking authority under the Spending and Commerce Clauses, 42 U.S.C. § 2000cc-1(b), RLUIPA protects religious exercise in land use and among institutionalized persons from undue government interference. *Id*. §§ 2000cc, 2000cc-1. Relevant here, § 2000cc-1 provides that no federally funded prison "shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … " unless the government shows that the burden furthers "a compelling governmental interest" by "the least restrictive means." *Id*. § 2000cc-1(a).[2] This marks Congress's second attempt to codify the strict-scrutiny standard of the pre-*Smith* cases. *West v. Radtke*, 48 F.4th 836, 844 (7th Cir. 2022). A prisoner alleging a RLUIPA violation may seek injunctive or declaratory relief. 42 U.S.C. § 2000cc-2(a); *West*, 48 F.4th at 844.

In RLUIPA Congress aimed at protecting the religious exercise of institutionalized persons. The Act generously defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). To satisfy RLUIPA, a prison may be required to make individual exemptions to general prison policies, *id*. § 2000cc-3(e), and to "incur expenses in its own operations to avoid imposing a substantial burden on religious exercise," *id*. § 2000cc-3(c). Congress further directs that

---

[2] Every state, including Wisconsin, accepts federal funding for its prisons.

RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." *Id*. § 2000cc-3(g). In these statutes, Congress exceeded even the pre-*Smith* protections prisoners expected while exercising their religion in confinement. *See Turner v. Safley*, 482 U.S. 78 (1987); *O'Lone v. Est. of Shabazz*, 482 U.S. 342 (1987); *see infra III*.

Congress also expressly acknowledged limits on RLUIPA's scope. That Act does not define "substantial burden," but the qualifier "substantial" signals that not all burdens on religious exercise need to be justified under strict scrutiny. 42 U.S.C. § 2000cc-1(a); *see infra* II.B. And instead of requiring a mere prima facie showing as in other places, Congress clarified that the prisoner "bears the burden of persuasion" in proving that the government "substantially burden[ed]" his religious exercise. 42 U.S.C. § 2000cc-2(b). Congress further instructed that "[n]othing in this chapter shall create a right of any person to receive government funding for a religious activity," *id*. § 2000cc-3(c) (citation modified), and "[n]othing in this chapter shall be construed to affect … the Establishment Clause," *id*. § 2000cc-4.

## B. "Substantial Burden"

Childs bears the initial burden of persuasion to prove "that the challenged prison practice substantially burdened his religious exercise and that his request for a religious exemption is sincere." *West*, 48 F.4th at 844 (citation omitted). No one disputes that Childs sought to engage in "religious exercise" by performing Salah, or that he sincerely believes he must start his prayers on time. The dispute centers on whether Childs has shown that the prison officials substantially burdened his religious exercise by not providing an

accurate prayer schedule, and if so, whether such a burden can survive strict scrutiny.

Absent a definition from Congress, courts initially developed their own tests for what constitutes a "substantial burden." The Supreme Court eventually clarified the requirement in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) and *Holt v. Hobbs*, 574 U.S. 352 (2015). In *Hobby Lobby*, the U.S. Department of Health and Human Services demanded that three closely held corporations provide health-insurance coverage for methods of contraception that violated the sincerely held religious beliefs of the companies' owners. 573 U.S. at 689. The regulation put the owners to a decision—to provide such insurance would violate their beliefs, but to opt out would force them to pay large financial penalties under the Affordable Care Act. *Id*. at 720. Acknowledging the coercive nature of this choice, the Court held that these regulations violated RFRA by placing a "substantial burden" on religious exercise that could not be justified under strict scrutiny. *Id*. at 690–91, 726, 729–30.

The Court reached a similar outcome in a companion case, *Holt v. Hobbs*. There, the Arkansas Department of Correction's grooming policy—prohibiting inmates from growing beards absent a particular skin condition—conflicted with a Muslim inmate's wish to grow a beard in accordance with his sincerely held religious belief. 574 U.S. at 355–56. To shave would "seriously violate" his beliefs, but to contravene the prison's grooming policy would expose him to significant disciplinary action. *Id*. at 361. Based on this coercive dilemma, like the one in *Hobby Lobby*, the Supreme Court held that the prison's grooming policy violated RLUIPA by placing a

"substantial burden" on the inmate's religious exercise that could not be justified. *Id*. at 361, 364, 367.

In light of *Hobby Lobby* and *Holt*, this court reevaluated the "substantial burden" test in *Schlemm v. Wall*, 784 F.3d 362 (7th Cir. 2015). There, an inmate and member of the Navajo Tribe wished to celebrate a Ghost Feast, part of a harvest celebration that "honors the dead through dancing, praying, and eating traditional foods." *Id*. at 363. The prison not only rejected the inmate's request for game meat, a traditional food, but also prohibited him from buying it for himself from an outside vendor. *Id*. Under our pre-*Holt* "effectively impracticable" test, the outright ban on one of the three Ghost Feast practices would not substantially burden religious exercise—the inmate could still dance and pray. *Id*. at 364; *see Eagle Cove Camp & Conf. Ctr., Inc. v. Woodboro*, 734 F.3d 673, 680 (7th Cir. 2013). But *Holt* and *Hobby Lobby* "articulate[d] a standard much easier to satisfy" than that, so this court rejected the test from *Eagle Cove*. *Schlemm*, 784 F.3d at 364. Focusing exclusively on the religious practice in question—eating traditional foods—this court held that the prison's outright ban on game meat violated RLUIPA by substantially burdening the inmate's religious exercise without sufficient justification. *Id*. at 364–65.

So far, our "substantial burden" caselaw has spoken to at least two kinds of cases. The first focuses on prison policies that entirely prohibit a practice based on a sincerely held religious belief. As in *Schlemm*, such an outright prohibition can place a substantial burden on religious exercise, regardless of what other practices remain available. *Id.* at 365. The second involves coercive dilemmas, as in *Hobby Lobby* and *Holt*. The "pertinent lesson" from those cases is that prison policies "forcing" the inmate "to choose between violating his

religion," on the one hand, "and incurring [some] negative consequence," on the other, substantially burden religious exercise. *West*, 48 F.4th at 845 (citation omitted). In evaluating whether a burden is substantial, courts "focus primarily on the intensity of the coercion applied by the government." *Id.* (citation modified).

Childs's case is not the first kind. Unlike the defendants in *Schlemm*, who banned the inmate from purchasing his own game meat from an outside vendor, the defendants here have not prevented Childs from obtaining or possessing a prayer schedule. As the district court noted, he received one by donation and always had the option to purchase one from an outside vendor.

Instead, Childs points to the second kind, those concerning a coercive dilemma. Quoting from *West v. Radtke*, Childs states that a substantial burden exists when "a prison attaches some meaningful negative consequence to an inmate's religious exercise, forcing him to choose between violating his religion and incurring some negative consequence." 48 F.4th at 845. As for whether a burden is sufficiently substantial, Childs again quotes from *West v. Radtke* which directs courts to "focus[] primarily on the intensity of the coercion applied by the government." *Id.* To evaluate that intensity, we consider the severity of the negative consequences in question. *Id.* In cases like *Holt*, the negative consequence is disciplinary action. *Holt*, 574 U.S. at 361; *West*, 48 F.4th at 845. But Childs does not face disciplinary action, so he must identify some other negative consequence.

In certain cases, the negative consequence is the financial cost an inmate bears to support his own religious practice. *See Jones v. Carter*, 915 F.3d 1147, 1150–51 (7th Cir. 2019). In *Hobby*

*Lobby*, the Supreme Court concluded that paying hundreds of millions of dollars in fines was a severe enough consequence that it put plaintiffs to the coercive choice RLUIPA seeks to prevent. 573 U.S. at 726.

*Hobby Lobby*'s logic was extended in *Jones v. Carter*. There, a Muslim inmate bore the cost of buying his own Halal meat, which he was required to eat on occasion based on his sincere religious belief. Despite the religious accommodation of a Kosher vegetarian diet, and though the inmate was free to purchase Halal meat himself, this court still found a substantial burden on religious exercise. 915 F.3d at 1150. The financial cost of "subsidizing his own religiously compelled diet" would "systematically outpace his reliable income." *Id*. at 1151. A prison policy forcing the inmate to choose between violating his sincerely held religious beliefs and giving "away his last dime," such as by paying the fines in *Hobby Lobby*, was sufficiently severe to apply the coercion RLUIPA forbids. *Id*. at 1150–51.

Childs's case falls short of *Jones*. He has not shown that the cost of paying for his own prayer schedule would force him "to give away his last dime." *Id*. at 1150. In fact, Childs has not alleged or shown facts concerning his reliable income, whether he is indigent, or how that relates to the cost of prayer schedules. But he did characterize the cost of prayer schedules as "de minimis," and he proposes no other negative consequences for our consideration. The question left open in *Jones*—whether a "truly negligible or unquestionably affordable" cost to subsidize one's own religious accommodation substantially burdens religious exercise, *id*.—remains open.

Our caselaw acknowledges that evaluating whether a burden is "substantial" invites line-drawing issues. *Schlemm*

recognized that the Supreme Court in *Holt* held that a policy "seriously violat[ing] [] religious beliefs" satisfies the substantial burden requirement. But the meaning of "seriously" is uncertain. 784 F.3d at 364–65 ("What, indeed, does 'seriously' mean?—more than 'modestly' and less than 'overwhelmingly,' but there's a lot of space in that range."). In *Jones*, this court noted that *Holt* and *Hobby Lobby* "involved large fines and significant disciplinary consequences." 915 F.3d at 1150. This court also stated that the "pressures of that severity [do not] represent[] the floor for finding a substantial burden under RFRA or RLUIPA." *Id*.

Our caselaw has not set that "floor." In *Jones* this court decided what level of financial hardship is enough to offend RLUIPA, but it did not decide what is required, noting that "Jones's case is not near any relevant line." *Jones*, 915 F.3d at 1150. Similarly, in *West v. Radtke*, we observed that "the relevant line—how much pressure is too much—may be difficult to draw with precision," but left it undrawn because "significant disciplinary consequences" were surely enough. 48 F.4th at 845.

Although *Hobby Lobby*, *Holt*, and our subsequent decisions leave the question unanswered, 42 U.S.C. § 2000cc-1 requires some sort of floor. Otherwise, "substantial burden" could mean *any* burden. RLUIPA must be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc-3(g). But to give a word a meaning it cannot bear goes beyond the "extent permitted by the term[]." *Id*. Congress incorporated a relative and proportionate term ("substantial") into the statute. So, RLUIPA's text requires courts to

evaluate the severity of the burden placed on an inmate and decide whether it rises to the level of "substantial."

The de minimis cost of purchasing a prayer schedule does not rise to the level of a "substantial" burden on religious exercise. Such a "truly negligible" and "unquestionably affordable" financial burden could not realistically coerce Childs to violate his sincerely held religious belief. *Jones*, 915 F.3d at 1150. Absent a true coercive dilemma, to conclude that Childs's claim still satisfies the "substantial burden" requirement of RLUIPA would give the word a meaning it cannot bear and render Congress's choice of the word "substantial" meaningless surplusage. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 174–79 (2012) (discussing the surplusage canon). And because Childs failed to carry his initial burden of persuasion, the government is not required to justify its policy under strict scrutiny.

Childs disagrees. His arguments, however, do not engage with the caselaw, the meaning of "substantial," or the line-drawing questions they both raise. Instead, he focuses on the necessity of a prayer schedule, that donations are not guaranteed, and that his incarceration limits his access to prayer schedules, such as by going online or visiting a mosque. But these facts are not disputed and beside the point. The defendants do not contest the necessity of a prayer schedule to comply with Salah under Childs's sincerely held religious beliefs. Childs remains free to purchase a prayer schedule through an outside vendor. Even absent donations and with incarceration limiting other options, if the cost of obtaining a prayer schedule does not substantially burden an inmate's religious exercise, RLUIPA is not violated.

### C. Duty to Purchase Religious Items

Thus far we have assumed that Childs's claim should be treated like any other RLUIPA claim. There is reason to question that assumption. Childs asks us to interpret RLUIPA to place affirmative duties on states to purchase religious items for inmates. This court has answered a similar question for certain religious meal accommodations, but not yet for religious items. *See Jones*, 915 F.3d at 1150. The district court distinguished between these two and concluded that RLUIPA categorically does not require states to pay for an inmate's religious items. The state asks us to reach the same conclusion. For this proposition, the district court and the state relied on *Cutter v. Wilkinson.* 544 U.S. 709, 720 n.8 (2005).

In *Cutter* the plaintiff brought a facial constitutional challenge to RLUIPA, alleging the Act violated the Establishment Clause. 544 U.S. at 713–14. Joining the majority of circuits, the Court held that "[the institutionalized-persons provision] of RLUIPA … qualifies as a permissible legislative accommodation of religion that is not barred by the Establishment Clause." *Id*. at 719–20. In this passage the Court announced: "Directed at obstructions institutional arrangements place on religious observances, RLUIPA does not require a State to pay for an inmate's devotional accessories." *Id*. at 720 n.8. To support this construction of RLUIPA, the Court cited *Charles v. Verhagen*, 348 F.3d 601, 605 (7th Cir. 2003). There, the court overturned a prison's prohibition on the possession of Islamic prayer oil but left the inmate-plaintiff to purchase the oil for himself. *Id*.

This language in footnote 8, which we refer to as *Cutter*'s rule, is part of the Court's holding and is thus binding. *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (aspects of

an opinion integral to its decision and reasoning are binding). The placement and logic of footnote 8 make it integral to the Court's conclusion that RLUIPA does not violate the Establishment Clause. The Court provided two reasons for so holding, both grounded in the now-abrogated *Lemon* approach to Establishment Clause challenges. *See infra* pp. 17–18 (explaining why *Cutter* remains good law even though based on now-rejected reasoning).[3] First, because RLUIPA merely removes "exceptional government-created burdens on private religious exercise," the Court concluded it looks more like an "accommodation" than an "endorsement" of religion. *Cutter*, 544 U.S. at 720 (citation omitted). Second, courts "properly applying RLUIPA" must administer it in ways that do not "founder on the shoals" of our "prior [Establishment Clause] decisions." *Id*.

The placement and logic of *Cutter*'s rule links it to the Court's reasoning and holding. Requiring states to purchase religious items, unlike the limited holding in *Charles v. Verhagen*, would "founder on [the] shoals" of prior Establishment Clause decisions as an "[im]proper[] appl[ication]" of RLUIPA. *Id*. *Cutter*'s rule thus cannot be dismissed as dicta.

---

[3] In *Lemon v. Kurtzman*, the Supreme Court announced a test to evaluate Establishment Clause challenges: the statute must have a secular purpose, its principal or primary affect must not advance or inhibit religion, and it must not foster excessive government entanglement with religion. 403 U.S. 602, 612–13 (1971). In *Kennedy v. Bremerton School District*, the Supreme Court described *Lemon* "and its endorsement test offshoot" as "long ago abandoned." 597 U.S. 507, 534 (2022). In *Groff v. DeJoy*, a unanimous opinion described Lemon as "now abrogated." 600 U.S. 447, 460 (2023).

Assuming *Cutter*'s rule survives any changes in intervening law, it binds lower federal courts.

Our fellow circuits agree. The Tenth Circuit relied on *Cutter*'s rule when it ruled that RLUIPA did not require a prison to pay for soft-cover Islamic books for Muslim inmates in *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1320–21 (10th Cir. 2010) (citing 42 U.S.C. § 2000cc-3(c); *Cutter*, 544 U.S. at 720 n.8). In a concurrence then-Judge Gorsuch explained that RLUIPA does not require "the state to provide prisoners . . . with everything they need for religious purposes," as evidenced by footnote 8 of *Cutter*. *Abdulhaseeb*, 600 F.3d at 1326 (Gorsuch, J., concurring) (citation omitted). Other circuits cite *Cutter*'s rule as binding law on state subsidy of religious items. *Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781, 793 (5th Cir. 2012); *Ackerman v. Washington*, 16 F.4th 170, 186 (6th Cir. 2021); *Pendleton v. Jividen*, 96 F.4th 652, 657 (4th Cir. 2024) ("To be sure, 'RLUIPA does not require a State to pay for an inmate's devotional accessories.'") (citation omitted).

Intervening changes in Establishment Clause jurisprudence do not call *Cutter*'s rule into question. In *Kennedy v. Bremerton School District,* the Supreme Court formally rejected *Lemon* and announced an originalist approach to Establishment Clause challenges. 597 U.S. 507, 535–36 (2022). Going forward, courts must evaluate Establishment Clause challenges by interpreting the First Amendment in light of the "historical practices and understandings" at the Founding. *Id*. at 535. If the Supreme Court were to decide *Cutter* today, its reasoning could look very different. Nevertheless, *Cutter*'s rule remains good law.

Unless and until expressly overruled, *Cutter*'s rule controls. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490

U.S. 477, 484 (1989) ("If a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Even when the Supreme Court has retained a specific holding while rejecting its reasoning, it has done so expressly. *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996) ("Without questioning the holding in *LaRue*, we now disavow its reasoning insofar as it relied on the Twenty-First Amendment.").

Before applying *Cutter*'s rule to Childs's claim, we consider how it fits into RLUIPA's burden-shifting framework. The state submits, and our fellow circuits suggest, that it fits most naturally as a cap on, or caveat to, what constitutes a "substantial burden" on religious exercise. *See Ackerman*, 16 F.4th at 186–87 (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008)). That view tracks the language in *Cutter* and the statute itself. Footnote 8 contrasts *Cutter*'s rule with "substantial burden" language: "Directed at *obstructions* institutional arrangements place on *religious observances*, RLUIPA does not *require a State to pay* for an inmate's *devotional accessories*." *Cutter*, 544 U.S. at 720 n.8. (emphases added). This is buttressed by the location of footnote 8, which clarifies that RLUIPA removes "government-created burdens." *Id*. at 720. To the Court, providing a prayer schedule is not required to avoid placing a "substantial burden" on religious exercise.

The text of 42 U.S.C. § 2000cc-3(c) also supports this view. There, Congress used contrasting clauses like in footnote 8. "Nothing in this chapter shall create … a *right* … of any person *to receive government funding* for a *religious activity*, but this

chapter may require a government to incur expenses in its own operations to avoid imposing a *substantial burden* on *religious exercise*." 42 U.S.C. § 2000cc-3(c) (emphases added). Refusing to create a right to receive funding for a religious item, in other words, cannot "impos[e] a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c). For these reasons, *Cutter*'s rule limits what is a "substantial burden" on religious exercise under RLUIPA.

We must now decide whether *Cutter*'s rule applies to Childs's claim. Prayer schedules are religious items or devotional accessories requested for or necessary to Childs's practice of Salah. RLUIPA therefore does not require states to purchase religious accessories for inmates. In denying what RLUIPA does not require, the defendants did not place a substantial burden on Childs's religious exercise. So the burden does not shift to the government to justify its policy.

Childs disagrees. He first tries to minimize *Cutter*'s rule. After accepting that RLUIPA does not require prisons to purchase devotional accessories, he claims that *Cutter* still acknowledges that RLUIPA "requires prisons to provide religious accommodations that prisoners need to practice their religion." That confuses the general and the specific. As to the general, RLUIPA requires governments to make accommodations to avoid placing unjustified substantial burdens on religious exercise. Sometimes the prison will incur expenses in their operations to do so. Yet, as to the specific, *Cutter*'s rule qualifies the general: whatever RLUIPA's scope, it does not require governments to pay for devotional accessories.

Childs next tries to distinguish prayer schedules from religious items or devotional accessories.[4] To Childs, a prayer schedule is not a physical item used for devotion. Rather, it merely contains information about time. He submits that the prison could meet its obligations under RLUIPA without providing the physical prayer schedule by posting times in public spaces or announcing them over loudspeakers.

But the focus on information is immaterial. Religious texts also provide information that could be conveyed through other means. And in both instances, the information aids devotion. Moreover, that the information may be conveyed in other ways does not mean the prison must provide that accommodation. Childs's proposed alternatives—such as announcing prayer times over the prison loudspeakers—could also present the same Establishment Clause concerns that underlie *Cutter*'s rule.

Childs also does not offer authority that supports his position, nor are we aware of any. The closest case is *Ortiz v. Downey*, 561 F.3d 664 (7th Cir. 2009). There, this court concluded that an inmate plausibly stated Free Exercise and RLUIPA claims when the prison "denied him religious articles and the opportunity to attend Mass." *Id*. at 670. But *Ortiz* was decided at the screening stage for prisoners' claims under 28 U.S.C. § 1915A, made no "determination about the ultimate merits," and did not "suggest[] an outcome." *Id*. Childs's claim was resolved on the merits at summary judgment.

---

[4] Oral argument, September 25, 2025, at 4:22-4:57 (https://ca7-ecf.sso.dcn/sound/storagelinkdir/oralArguments/2025/sk.24-1817.24-1817_09_25_2025.mp3).

*      *      *

For these reasons, Childs's RLUIPA claim fails. Under our caselaw, the de minimis cost of purchasing one's own prayer schedule does not place a "substantial burden" on religious exercise. Moreover, RLUIPA, aimed at removing government-created burdens on religious exercise, does not require states to pay for religious items for inmates.

### III. Free Exercise Claims

Childs has two Free Exercise claims. In the first he submits that the prison's policy against providing prayer schedules violates the Free Exercise Clause. But prison policy, which does not permit the purchase of personal property for inmates, religious or secular, is a neutral and generally applicable rule that does not violate the Free Exercise Clause. *Smith*, 494 U.S. at 878. Childs counters that *Smith* does not apply to an inmate's Free Exercise claim. For support, he argues that *Smith* did not expressly overrule earlier Free Exercise cases specific to the prison context. *Turner v. Safley*, 482 U.S. 78 (1987); *O'Lone v. Est. of Shabazz*, 482 U.S. 342 (1987).

Assuming without deciding that *Turner* and *O'Lone* still apply to neutral prison regulations, Childs's Free Exercise claim would fail under these pre-*Smith* cases too. To survive summary judgment on his Free Exercise claim, Childs had to make a prima facie case by "submit[ing] evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices*." Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (citation omitted). A substantial burden "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson v. Holm*, 809 F.3d 376, 379 (7th

Cir. 2016) (citation omitted). A substantial burden on religious exercise is unjustified if it is not reasonably related to a legitimate penological interest. *Id*. at 380 (citing *Turner*, 482 U.S. at 89–91).

Childs's first claim does not clear the threshold. For the same reasons his RLUIPA claim fails, buying his own prayer schedule does not place a "substantial pressure" on Childs to "violate his beliefs." *Thompson*, 809 F.3d at 379. Because the cost is de minimis and prison officials have not blocked Childs from obtaining or possessing a prayer schedule, he has not advanced a prima facie case that his right was burdened. Therefore, the state need not justify its policy as reasonably related to a legitimate penological interest. *Id*. at 380. We also see *Cutter*'s rule applying to a Free Exercise claim. The rule originated in pre-RLUIPA Free Exercise cases. *See, e.g., Frank v. Terrell*, 858 F.2d 1090, 1090–91 (5th Cir. 1988) (affirming dismissal of a frivolous Free Exercise claim that sought state subsidy of religious books, a prayer shawl, a tallit, sermon tapes, a kippah, and other religious materials) (citing *Cruz v. Beto*, 405 U.S. 319, 323 (1972) (Burger, C.J., concurring) ("There cannot possibly be any constitutional or legal requirement that the government provide materials for every religion and sect practiced in this diverse country. At most, [religious] materials cannot be denied to prisoners if someone offers to supply them.")).

In Childs's second Free Exercise claim he contends that providing inaccurate prayer schedules in the first part of 2023 violated that First Amendment right. He has waived this claim. The district court ruled that a negligence claim is not actionable under § 1983. On appeal Childs has not alleged intentional or reckless conduct. He therefore "failed to present

a developed argument on appeal that engages with the reasoning of the district court." *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

## IV. Conclusion

Childs's RLUIPA claim fails because a de minimis cost to buy his own prayer schedule does not substantially burden his religious exercise. Further, the Act, aimed at removing government-created burdens, does not require states to purchase religious items for inmates. For similar reasons, Childs's Free Exercise claims fall short or were waived.

AFFIRMED.